## Charles v. Flanary.

(Decided October 21, 1921.)

### Appeal from Pike Circuit Court.

1. Elections—Primary Elections—Contest—Evidence.—Subsection 28 of section 1550 of the statutes providing for contesting primary elections nowhere fixes the time within which the parties shall. commence or complete the taking of their proof before the convening of the court for trial; but it does provide only that the court or judge hearing the cause may limit the time of each party to five days within which he may produce or introduce his proof at the trial, and to one day each for the introduction of rebuttal proof, unless the ends of justice demand that such limitations be extended. If the proof may be heard within a less time than that prescribed the court has the power and it will be its duty to confine the parties to a lesser time.

2. Elections—Primary Elections—Contest—Corrupt Practice Act.— While it is necessary in election contest proceedings to show affirmatively by the evidence that the party charged with violating the Corrupt Practice Act knew that others corruptly used money in the election in his behalf, yet that fact may be shown by circumstantial evidence of greater convincing force than to create a mere suspicion, and when guilty circumstances are shown of the nature indicated, the court is authorized to find the principal fact the same as in other character of cases in which circumstantial evidence is held sufficient; but in this case there is positive direct evidence of the corrupt practices complained of.

3. Elections—Primary Elections—Corrupt Practice Act.—The words "election" and "elected," as used in the Constitution, do not include primary elections for the nomination of candidates, nor the nominations made at such primaries; hence, it was competent for the legislature to provide, as it did in section 11 of the Corrupt Practice Act, "that the candidate who has received the next highest number of votes and who has not violated the provisions of this act shall be declared nominated;" nor is the quoted provision unconstitutional because not included in the title to the Corrupt Practice Act, as is required by section 51 of the Constitution, since the title in stating the chief purpose of the act says: "An act to promote pure elections, primaries and conventions, and to prevent corrupt practice in the same," and the conferring by the

statute of the nomination on the innocent candidate who has not
violated the act is promotive of its general purpose as expressed
in the title.

4.    Elections—Primary Elections—Deprivation of Office.—Section 151
of the Constitution deals only with the right and power of the
legislature to deprive one of office after he has been elected at a
general election upon any of the grounds stated therein or in any
statute enacted thereunder, and it has no reference to depriving
one of his nomination as a candidate either at a primry election
or otherwise.

J. J. MOORE and WILLIS STATON for appellant.

JOHN D. CARROLL, HAZELRIGG & HAZELRIGG and STRAT-
TON & STEPHENSON for appellee.

OPINION OF THE COURT BY JUDGE THOMAS— Affirming.

This is a contest proceeding for the Republican nomina-
tion for the office of county judge of Pike county, and was
instituted under the provisions of subsection 28 of sec-
tion 1550, Kentucky Statutes, by the appellee W. E. Flan-
ary against the appellant, W. W. Charles, both of whom
were candidates for the nomination in the primary
election on August 6, 1921. The regular judge of the
Pike circuit court, where the proceedings were pending,
declined to sit and hear the case, and the special judge,
who was appointed by the Governor to try it, dismissed it
upon the ground that the notice of contest was not served
in time, but at the present term of this court that judg-
ment was reversed (Flanary v. Charles, ante 355), and
upon a second hearing when the case was heard upon its
merits, it was adjudged that the appellant and contestee
Charles, who received 360 votes more that the contestant
Flanary, was not entitled to the nomination because he
had violated some of the provisions of what is known as
the Corrupt Practice Act, which is sections 1565b-1565-21,
vol. 3, Kentucky Statutes, both inclusive, and being chap-
ter 13, page 53, Session Acts 1916, and the nomination
was awarded to Flanary, he having received the next
highest number of votes and had not violated any of the
provisions of the statute.

From that judgment the contestee prosecutes this ap-
peal, and for a reversal his counsel urge three grounds:
(1), that the court erred in admitting any evidence for the
contestant because it was not taken within five days after
the issues were made up; (2), that the evidence is not suf-
ficient to sustain the judgment, and (3), that section

1565b-11 is unconstitutional in so far as it authorizes the awarding of the nomination to any candidate not receiving a majority or a plurality of all the legal votes cast in the election. These grounds will be disposed of as briefly as possible in the order named.

1. The notice of contest was served on appellant on the 16th day of August, 1921, and warned him to appear and answer on the 22nd day of that month, when he appeared at the place stated in the notice and filed his answer and grounds of counter contest, and on the next day (August 23) the reply of contestant was filed and an amended reply was filed on the day following, when the issues were completed. On the 24th of August the regular judge of the district notified counsel for contestant that he would be in Pikeville to try the case on the 27th of that month, which was on Saturday. On the next day he notified the same counsel that for reasons which he deemed satisfactory he declined to sit in the case, and on the Monday following entered an order to that effect. On Tuesday, the 30th, the Governor designated a special judge to preside and try the case and on the next day he notified the clerk of the court that he would hear the case on September 5th on oral proof. Contestant began the taking of his proof by depositions on August 29, and continued to do so on August 30 and 31, when his counsel learned of the appointment of the special judge to try the case and of his intention to hear it on September 5 on oral proof. Thereupon counsel adjourned the taking of depositions and subpoened the witnesses to appear for the trial on September 5 to testify orally.

The position of counsel concerning this ground, as we understand it, is, that the statute providing for the contest of a primary election (subsection 28, section 1550) coupled with some statements in the opinion in the case of Lay v. Rose, 177 Ky. 303, required appellant to immediately commence the taking of his testimony after the issues were made up on August 24, and to complete it five days thereafter, which would not be later than August 30. It is therefore insisted that no evidence taken after that date, and no oral evidence introduced thereafter could be legally heard at the trial which occurred more than a month afterwards, and the court erred in the admission of any of it at the trial, although it composed the great bulk of contestant's testimony. We cannot agree with this contention. If the language of the opinion of the Lay case, upon this point, which is so much relied on

by counsel, was pertinent and necessary to the determination of the only question involved therein, and possessed no elements of dictum, it would not necessarily follow that counsel's position was correct, for in that case no judge was obtained to try the case until more than a month after the issues were made and the statements of the opinion, upon which counsel rely, were made in the light of the peculiar facts presented. But, as indicated, the question of practice involved was not before this court for the purpose of determination in that case, since it was held that the contest notice was not filed within the requisite five days after the ascertaining of the result of the election by the election commissioners, from which date, the opinion held, the time for instituting the contest commenced.

We have read the statute providing for this character of contest with great care and fail to find any provision in it which expressly or by implication fixes the time within which either party may take or complete his testimony. The time *is* prescribed in which the pleadings shall be made up, and it says: "The judge shall proceed to a trial of said cause within five days after issue is joined as herein provided," which latter requirement is necessarily directory. Power is conferred upon the court or judge trying the case to hear the witnesses orally, or require the parties to take the proof by deposition, neither of which requirements can be made until a judge is found who is willing to preside at the trial, and, of course, the oral proof cannot be heard except during the trial.

It is further provided that, "The court may require the contestant, or the person who has the burden of proof under the issues joined, to complete his proof in not less than five days, and the contestee, or the person not having the burden, to complete his proof in not less than five days thereafter, and each party may be given one day additional for producing evidence in rebuttal, and no greater time shall be extended, unless the court be satisfied that the ends of justice demand it." This provision clearly refers and applies to the hearing of evidence and the introduction of testimony *at* and *during* the trial of the case, i. e., the court may limit the time within which the one having the burden may introduce his testimony upon the hearing to five days, and the same limitation may be imposed upon the other party, and each of them may be confined to one day for the introduction of rebuttal tes-

timony "unless the court is satisfied that the ends of justice demand" an extension of time. The purpose of the legislature evidently was to limit the time consumed in the trial to twelve days, if possible, and thereby further the central idea of speed in disposing of the contest. It is easy to imagine many contests covering large districts or territories, where many grounds and collateral issues are involved, that twelve days would be an exceedingly short time in which to try the case, and under the statute, if the ends of justice demand it, that time may be extended by the court. On the other hand, the judge is not forbidden by the statute to limit the time for the introduction of testimony to a less number of days than the statute specifies, if no injustice will be done, and in that case it would be his duty to do so. So interpreting the statute it follows that this ground is without merit.

2. As heretofore stated, the sole grounds of contest and counter contest, tried below and involved on this appeal, are violations of the Corrupt Practice Act by the respective parties. As against the contestee it is alleged that he spent in the election, or others spent for him with his knowledge and consent, more than $1,000.00, which is the maximum amount for purely legitimate purposes allowed by the statute for a county office, and that. he failed to include any part of it in either his ante or post election expense accounts, which the act requires to be sworn to and filed by the candidate. Furthermore, it is alleged that he, with candidates for other nominations, formed a slate and pooled their money in a "jack pot" to be used in the election, and especially on the election day, to bribe and otherwise corrupt voters to support the candidates who were members of the pool, and that he contributed to that fund as much as $4,000.00, which was used by his friends and "strikers" at the various precincts of the county on election day in carrying out the purpose for which it was contributed with his knowledge and consent, all of which was in direct violation of the provisions of the Corrupt Practice Act.

On the day of the election appellant was at the Knox precinct in Pike county, which contains some three or four hundred Republican voters. As many as three unimpeached witnesses testified that they saw him at that precinct during the election day with a large amount of money composed of small bills, and that he, on a number of occasions, gave some of it to the witnesses for the pur-

pose of paying for votes cast for him, and that the money was so paid with his knowledge and consent. Furthermore, that he himself paid a number of voters the amount they demanded for casting their vote for him, which payments were done sometimes behind the house in which the election was held, and at other times he dropped the money on the ground and the voter picked it up. Appellant denies all of that guilty testimony, but admits being at the precinct on election day with a considerable amount of money and that he may have dropped some of it during the day, but that the only money which he remembers to have spent was for some gingerbread, although he was active in seeing that his name got upon the slips which "strikers" for himself and other candidates were making out and giving to the voters who were paid their price when the names on the slip were voted for.

On Tuesday preceding the primary election appellant went to the office of J. M. Bolling, who was and is the Commonwealth's attorney of that judicial district, and with him was a man by the name of Whitt, and the two went into a room back of the office, in which there was a bed, and sitting upon it was Anse May, around whom were scattered on the bed a great number of one and two dollar bills, which he was placing in envelopes. May was a candidate for the Republican nomination for county court clerk of the county and was on the slate with appellant. A short time thereafter W. W. Barrett, the county attorney of the county, whom appellant acknowledged was his chief campaign manager, came into the room and brought with him a large bundle of money wrapped in a newspaper which he threw upon the bed and mixed it with that which was already there. The envelopes soon ran out and Whitt was given fifty cents by appellant and instructed to buy more, which he did. Barrett seems to have taken charge of as many of the envelopes as were to be handled by appellant as a member of the pool or slate to which he belonged, and gave one of them containing $150.00 to Whitt with directions for him to use the money contained in it at the latter's precinct on election day, and the directions, according to the witness, were carried out. Barrett gave envelopes containing different amounts of money to other "strikers" or "workers" for appellant to be used at other precincts in the county, and the circumstances testified to leave no doubt but that all of the money in that back room was

not only provided, but was actually used on the election day, for appellant and those associated with him on his slate.

On the same morning of the meeting in Bolling's office Barrett applied to the Peoples Bank of Pikeville and inquired if he could draw a draft on the bank of Freeburn, West Virginia, of which appellant was president. He was informed that he could and some officer of the bank filled in a blank draft, drawn on the Bank of Freeburn and payable to the Peoples Bank of Pikeville, for the sum of $2,500.00, and delivered it unsigned to Barrett. He was gone a little while and returned with the signature "W. W. Charles" written thereon, and he procured the $2,500.00 called for by it and carried it to Bolling's office, where it was handled in the manner hereinbefore stated. That draft was paid by the Freeburn bank on August 5, three days after it was drawn and was charged to the account of appellant, and the cashier testified that the signature to it was the handwriting of appellant, and the teller of the Peoples Bank of Pikeville testified substantially the same. At the beginning of his testimony, and when the draft was not present, appellant denied having signed it or any knowledge concerning it, but when he was confronted with the draft later in the trial he said, "If it is not my signature it is a fine imitation." He could not be induced by the most rigid cross-examination to state whether the signature to the draft was made by him, and the answer given above was as responsive as he could be induced to make to the most direct questions. Barrett, who, as we have seen, was the general manager of the appellant's campaign, was subpoened by contestant to appear at the trial and testify orally, but he disobeyed the subpoena and was absent throughout the trial, although he conversed with appellant on the last day he was seen in Pikeville before his departure. It is true that appellant served Barrett with a subpoena for the purpose of taking his deposition on September 30, 1921, but no effort was made by him to procure the presence of Barrett to testify orally on the trial of the case.

It is seriously insisted that the testimony as above briefly stated, was insufficient under the ruling in the case of Hardin v. Horn, 184 Ky. 584, and cases referred to therein, to sustain the charges upon which the judgment was based, and for that reason it was the duty of the court to dismiss

the contest. In those cases, particularly the one named, the proof of alleged violation of the statute consisted in the wrongful expenditure of money by friends of the candidates whose nominations were contested; there being no evidence to show that it was done under their directions or with their knowledge, and the court said: "In the absence of some affirmative evidence connecting the contestees with a knowledge of it, it is insufficient to bring home to them any violation of the law." Evidently the court in that case, by the use of the words "affirmative evidence," meant that there must be something more than bare suspicion, and did not intend to say that properly proven circumstances from which the principal fact might be logically and unerringly deduced would not constitute affirmative evidence, since facts necessary to support the grounds for election contest proceedings may be proven by circumstantial evidence as well as in other cases, even in criminal prosecutions. We not only have in this case extreme evasiveness and want of candor on the part of appellant in giving his testimony, but he exhibits a most extreme lack of memory, and the childlike innocence with which he looked upon the money on the bed in Bolling's office, and the preparations of it there being made, without the slightest suspicion of what it all meant, or the remotest idea of the use which May and his representative Barrett intended to make of it, is most remarkable, and would easily stamp him as a dupe were it not for the fact that he is president of a bank and possesses the legal qualifications for the office of county judge. But we are not relegated in this case to circumstantial evidence for the *affirmative proof* necessary to convict appellant of the violations with which he is charged. He knew that Barrett had the money in Bolling's office and he knew that he had furnished that money. He then and there saw that it was being prepared for use on election day, and some of it was given to Whitt in his presence to be used on that day and which was so used. There is no doubt but that he knew that Barrett had given to others sums of money to be used for the same purpose and that it was so used, and, finally he is shown himself to have used money corruptly at the Knox precinct on the day of the election.

The purpose of the enactment of the statute was to prevent the unlawful practice of using money corruptly in elections, and courts should lend a willing hand in its

enforcement where the facts and circumstances justify it. No reluctance should be exhibited, nor should the court indulge in any unsubstantial technicalities whereby the offending candidate may be excused; for it is doubtful if there is any practice which strikes more deeply at the root of civilization and our republican form of government than the corruption of elections with money or other unlawful influence. If the practice is allowed to continue unchecked elections will become mere matters of barter and sale and the perpetuity of our institutions will be utterly destroyed and decay and revolution will be the ultimate and inevitable result, since pollution of the electorate invites certain political demise.

The evidence in this case convinces us beyond doubt that appellant was guilty of the acts alleged against him and the court properly declared his nomination void, and properly awarded it to appellee, since we are clearly of the opinion that the evidence did not convict him of a violation of the statute, provided section 1565b-11, which is section 11 of the Corrupt Practice Act, is valid, a question which we will determine in disposing of ground (3) relied on.

3. The section last referred to says: "In any contest over the nomination or election of any officer mentioned in this act, it may be alleged in the pleadings that the provisions of this act have been violated by the candidate or by others in his behalf with his knowledge, and if it so appears upon the trial of said contest, then the said nomination or election shall be declared void, and it is hereby provided that the candidate who has received the next highest number of votes and who has not violated the provisions of this act shall be declared nominated or elected unless it also appears that one of the parties to the contest received a plurality of the votes cast and did not violate the provisions of this act."

Counsel for appellant vigorously contend that the portion of the section saying, "It is hereby provided that the candidate who has received the next highest number of votes and who has not violated the provisions of this act shall be declared nominated or elected," is unconstitutional because (a), it is incompetent for the legislature to provide for the nomination of a candidate in the primary election who received less than a majority or plurality of the legal votes cast; (b), that the title to the Corrupt Practice Act is not sufficient to include

the proviso under consideration, and it is therefore unconstitutional as not conforming to section 51 of the Constitution, which in part provides that ''No law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title,'' and because (c), under the provisions of section 151 of the Constitution the legislature was not authorized to go farther, in legislating against corrupt practices in elections, than to penalize the guilty candidate by depriving him of the office, and that it had no right in such legislation to say that his opponent who received less than a plurality or majority of the legal votes cast in the election should become the nominee, though innocent of any corrupt practice.

In support of reason (a) the doctrine announced in the case of McKinney v. Barker, 180 Ky. 526, is relied on, and if the principles announced in that opinion, to which we still adhere, are applicable in this case, the point is well taken.  On the contrary, if they are to apply only to general elections, at which the office is to be filled, and not to a primary election, at which only a candidate is to be selected or nominated, then this reason will have to be denied.

The McKinney case was a contest over a general election, and it was expressly stated in that opinion that ''In this case we are not concerned about the effect of such a provision (the one under consideration) in a contest over a nomination at a primary election, for the one here involved is a general election to fill the office.'' The underlying reason for the McKinney opinion was that the word ''elected,'' as used in the Constitution, should be given its common law and generally understood definition, which was that the person or proposition to be ''elected'' or carried, as the case might be, should receive either a majority or a plurality of the legal votes cast at the election, and that nothing short of such majority or plurality would constitute an election to office or the adoption of a public measure.

Statutory primary elections for the purpose of nominating candidates for offices are but substitutes for party machinery for the accomplishment of the same purpose with the adoption of such regulatory measures as the legislature may deem proper to safeguard purity, honesty and fairness in the selection of candidates.  It was thought that with such safeguards the chicanery of

the politicians would be circumvented, and more efficient and better qualified candidates would be selected. The scheme was unknown at the time of the adoption of our present Constitution, nor was it in use at any time prior to that, so far as we are aware. Nowhere in the Constitution is reference made to a primary election, either statutory or otherwise. If party organizations, through and by which nominations were made prior to the enactment of the primary election law, could regulate the nomination of candidates, including provisions for determining who was entitled to the nomination, we fail to see why the legislature could not adopt the same or similar rules and regulations in providing for nominations in primary elections. There neither was, nor could be, any legal reason, so far as we are informed, why a political party, through its duly constituted authorities, might not provide for the nomination of its candidates by a vote less than a majority or plurality of the nominating body. And that being true it is difficult to perceive why the statutory method, which took the place of the party method, may not make similar provisions, especially as against a candidate who has proven himself unworthy to receive the nomination.

But, the question is not an open one in this state, for in a number of cases it has been held that a primary election is not included in the term "election" as used in the Constitution. Montgomery v. Chelf, 118 Ky. 766, 26 Ky. L. R. 638; Hodge v. Bryan, 149 Ky. 110; Marshall v. Dillon, idem 115, and Hager v. Robinson, 154 Ky. 489. See also 20 Corpus Juris, 114, 9 R. C. L. 1074, and Ledgerwood v. Pitts, 122 Tenn. 570, 125 S. W. 1036. There are also a number of cases from other states cited in note 5 to the text of Corpus Juris referred to. Without further elaboration, since the exigencies of this case will not admit of it, we conclude that the doctrine announced in the McKinney case is not applicable to primary elections under our statute.

In disposing of reason (b), but little need be said. The title to the Corrupt Practice Act says: "An act to promote pure elections, primaries and conventions, and to prevent corrupt practice in the same; to limit the expenses of candidates; to prescribe the duties of candidates and providing penalties and remedies for violations, and declaring void, under certain conditions, elections in which these provisions, or any of them, have been violated." Anything which is germane to the

general purpose of the act as stated in the title, as frequently held by this court, is not inimicable to the requirements of section 51 of the Constitution. The central purpose of the act as stated in its title was "to promote pure elections, primaries and conventions, and to prevent corrupt practice in the same." That purpose could be promoted by elevating the candidate receiving the highest number of votes, and who has not been guilty of corrupt practice, to the nomination as well as by withholding the nomination or election from a candidate who received a majority or a plurality of the legal votes cast but who was guilty of such practice. The statute, as enacted, not only holds out an incentive to each candidate for the same office to desist from any corrupt practice so that he might in a possible event be awarded the nomination although he did not receive a majority or plurality of the votes cast in the primary election, but it also makes all of them watchful of the conduct of the others and in doing so it provides the most effective means for safeguarding the purity of primary elections thus far suggested. We therefore conclude that the provision under consideration is not only germane to, but is essentially promotive of, the expressed purpose for the enactment of the statute.

Section 151 of the Constitution upon which is based reason (c), says: "The General Assembly shall provide suitable means of depriving of office any person who, to procure his nomination or election, has, in his canvass or election, been guilty of any unlawful use of money, or other thing of value, or has been guilty of fraud, intimidation, bribery, or any other corrupt practice, and he shall be held responsible for acts done by others with his authority, or ratified by him." A careful reading of that section will disclose that the authority conferred on the legislature by it is one relating exclusively to the *"depriving of office* any person who, to procure his nomination or election, has in his canvass or election," been guilty of any of the acts denounced therein, or of any corrupt practice which the legislature might incorporate in any statute enacted under the authority conferred by the section. It nowhere, expressly or by implication, refers to the right of the legislature to deprive one of his *nomination* for office by primary election or otherwise, but leaves that question untouched. It is true that the legislature was authorized under it to *deprive one of his*

*office* who was proven guilty of the forbidden practice, whether it was employed in securing the person's *nomination* or in securing his *election* after his nomination. In other words, the legislature was empowered by the section to prescribe as a ground for depriving one of office, whether by contest proceedings or otherwise, that he was guilty of corrupt practice in procuring his nomination, though his conduct after that time was unimpeachable. However, no statute has yet been enacted permitting one to be *deprived of his office,* by contest or otherwise, for corrupt practice in securing his *nomination,* though it may be done under the Corrupt Practice Act, where the violations occurred in the general election. The section, then, dealing exclusively with the right of the legislature to deprive one of office after his final election for violating any provision which might be enacted against corrupt practice, and by implication confining it to penalizing the violator of any statute which it might enact thereunder, it follows that the power of the legislature with reference to the regulation of *nominations,* by primary elections or otherwise, was unmolested by the section. This interpretation of section 151 renders reason (c) unavailable.

In view of the fact that there is but little time intervening till the general election it might not be amiss to say, though the question is not presented, that it is the opinion of the court that the limit for filing certificates of nomination to forty-five (45) days before the general election should not apply in cases like this, and the clerk of the Pike circuit court will cause to be printed the name of appellee as the Republican candidate for county judge on the ballot to be voted for at the general election on November 8, 1921, as certified by the judgment below and by this opinion.

There being no other grounds attacking the judgment it results that it should be and is affirmed and an immediate mandate issue.