# Greene v. Cawood.

(Decided October 8, 1929.)

E. H. JOHNSON and J. B. SNYDER for appellant.

J. S. FORESTER and CHAS. B. SPICER for appellee.

Opinion of the Court by Commissioner Stanley—Reversing.

Appellant, J. S. Greene, appellee, Joe Cawood, and Robert Harris, were candidates for the Republican nomination for sheriff of Harlan county in the August, 1929, primary election. On the face of the returns, Cawood received 6,950 votes, Greene 6,355, and Harris 584. Greene instituted a contest against the other two candidates, and they responded with counterclaims. The special trial court dismissed the petition and cross-contests, and held Cawood entitled to the nomination. Greene appeals.

Harris is not a party to this appeal, and his claims may not be considered.

The contestant charged fraud, bribery, and other violations of the Corrupt Practice Act and irregularities in the election, such as open voting, miscounting of ballots, and the opening of a certain poll two hours before the time fixed by law. On a recount in three precincts, he gained 102 votes, but abandoned further efforts along that line.

At the close of the testimony in his behalf, the contestant, by an amended petition, admitted that the Corrupt Practice Act had been violated in his behalf with his knowledge, thereby eliminating himself so far as receiving the certificate of nomination is concerned. But he insisted that the contestee, Cawood, was not entitled to it. This he was authorized to do under McKinney v. Barker, 180 Ky. 526, 203 S. W. 303, L. R. A. 1918E, 581. A public office does not possess the attributes of private property; so an election contest suit in its essence is not a controversy between parties in the sense of ordinary litigation, but is in the nature of an inquiry into the purity of the election. On this appeal, aside from the preliminary question of jurisdiction, we have for determination only whether or not the appellee should have been awarded the nomination under the evidence as to the violation of the Corrupt Practice Act by him or in his behalf with his knowledge.

On the motion to quash the officer's return of service of notice of contest and a plea to the jurisdiction of the court, two issues were made, namely: (1) Whether the notice was delivered to the wife of the contestee at his home, after a diligent search had failed to find him, or delivered by mistake to another woman; (2) whether the election commissioners ascertained who was the nominee on Tuesday, August 6th, or Wednesday, August 7th, upon which decision would depend the validity of a second service on August 12th, conceded to have been properly made.

The officer's return of service made on the 10th was to the effect that after a diligent search for the contestee, Joe Cawood, he was unable to locate him, and that the notice was thereafter executed by delivering a copy to Mrs. Joe Cawood at the contestee's home. First, it is clear that diligence was exercised in the efforts to serve the papers personally on the contestee. Second, the contestee undertook to prove that the copy of the notice was

delivered to Mrs. Viola Schell, a sister-in-law of Mrs. Cawood, who lived several hundred yards away, but who at the time happened to be in Cawood's yard. Mrs. Schell testified the notice was handed to her, with the request that she deliver it to Mr. Cawood, but this she did not do until the following Wednesday. Several of the neighbors corroborate her. Others testify they saw it delivered to Mrs. Cawood. The officer did not know Mrs. Cawood personally, but she was pointed out to him at the time, and the facts and circumstances detailed by him indicate that it was she. A number of women and men, who had come to Cawood's home to attend a trial (Cawood being a magistrate), testified that they saw the paper delivered to Mrs. Cawood. Mr. Cawood says he was in Harlan during the day, but in his home town of Evarts in the afternoon. He returned to Harlan that night, and, while denying that he then employed attorneys to represent him, he was evasive as to having consulted counsel that night. Other evidence is equally conflicting, and some of it is unreasonable and incredible.

It seems hardly possible that the simple identification of a woman who has lived in a community many years, and who is the wife of the magistrate, could honestly and really be the source of so much contradictory evidence. To illustrate: One Burkhart, a resident of the town and a garage man, testifying in behalf of the contestee, stated that he was just driving around the block two or three times for pleasure, and on one of the rounds saw some man unknown to him deliver some papers to Mrs. Schell just inside Cawood's gate. He saw Cawood after this, but never informed him of it. Before the close of the trial, and after the contestant had proved by several witnesses that they had seen the deputy sheriff, Potts, deliver papers to Mrs. Cawood, Burkhart again takes the witness stand, and testifies that after the occasion previously mentioned by him he and one Andy Crider went home and got some deeds to some lots, which the witness had sold Cawood, and he had Crider get out of the machine and deliver these deeds to Mrs. Cawood at the place and at the time the other witnesses testified to having seen the deputy sheriff deliver papers to her.

Again: Joe Young, who knew Mrs. Cawood, went with Deputy Sheriff Potts for the purpose of identifying her. He made an affidavit on the 15th, stating positively that Potts executed the notice on Mrs. Cawood. On the 16th, he made another affidavit that the papers were de-

livered to a woman he did not know; that he had since seen Mrs. Cawood, and that she was not that woman. On the 27th Young made still another affidavit, in which he recited in detail the conversation and circumstances of the delivery of the papers to Mrs. Cawood, who he there says he did know; and further that, about midnight of the 15th, contestee, Cawood, Deputy Sheriff Potts, and W. M. Howard, circuit clerk, came to his house, and that Cawood persuaded him that he could not positively swear the woman was Mrs. Cawood; that the next morning, in Howard's office in Harlan, he signed a paper without reading it (the affidavit of the 16th); that Howard gave him a drink of whisky and suggested that he "wanted to be gone when the trial comes off;" that when he went out of the office he found a roll of money in his pocket. He left, and came back in a few days. Then Dr. Cawood gave him $100 to again get away, and he collected another drink and $40 more from Howard, and then went to Pineville, where he was when he signed this affidavit.

The court has considered all the evidence heard on this issue, and reaches the conclusion that it is not sufficient to overcome the presumption of the regularity of the officer's return. It takes clear and convincing evidence to impeach the return of process by an officer, and this evidence is not of that character. Section 3760, Ky. Stats.; Tackett v. Mayo, 210 Ky. 299, 275 S. W. 866. This conclusion obviates the necessity of considering the issue as to the time the election commissioners ascertained who should receive the certificate on the face of the returns.

On the merits of the case the evidence is equally conflicting. Many of the witnesses for both sides, including the contestee himself, were impeached by testimony that they were of bad reputation. Then some of the impeachers were likewise impeached. On the contrary, the reputation of most of the witnesses was declared to be good. Some of the witnesses most damaging to appellee's case were not assailed.

The evidence introduced by the contestant was in substance that, on Tuesday night next before the election, there was a meeting held at the headquarters of Scott Gross, a candidate for jailer, attended by the contestee, Joe Cawood, his brother, Dr. W. P. Cawood, Scott Gross, Caleb Gross, Aley Gross, and Ira Fields; that it was agreed that Cawood and Scott Gross would pool their money and run together, except in four named precincts,

where Cawood was lined up with Theodore Middleton, another aspirant for the nomination for jailer; that the contestee, his brother, Dr. Cawood, and Grant Gross, each agreed to put in $5,000, and Scott Gross $1,400; that Gross was to be Cawood's chief deputy, and they were to divide equally the emoluments of the office. Several witnesses testified to having received money from Grant Gross to be used in the purchase of votes, and which was so used with his knowledge. One of them testified that he bought 75 votes for the contestee and those with whom he had combined. Sam Turner stated that he and Grant Gross together bought for contestee 20 votes, "the first drop out of the box." The names of a number of others are given as having received money from him in various sums. The evidence shows that Grant Gross was an authorized representative of the contestee. It is admitted that he was to be one of his deputies, but denied that there was to be an equal division of the emoluments. Much of this testimony pertaining to the combination and the general activities is substantially corroborated by other undenied evidence and significant circumstances, as well as by certain admissions by the parties involved.

The contestee categorically denied all the charges. He admitted attending the meeting on Tuesday night before the election, and that a "line-up" with Scott Gross was discussed, but he did not think the subject of money was mentioned. He denied the pooling of money, and that the sums stated were contributed or agreed to be contributed. It is significant that Dr. Cawood, who was present at the meeting and who, it was testified, was to put in $5,000 and Aley Gross, did not testify; also that Ira Fields, a supporter of contestee, could not be found with a warrant for his arrest. Grant Gross admitted drawing out $1,800 from the bank just before the election, but claims to have used only $50 of it. He testified that he was to be an office deputy under Cawood; that he put up no money for him, but did spend six weeks electioneering in his behalf. He admits that he and Sam Turner bought some votes, but says they were for a named candidate for county judge. He denies having received any authority from contestee to act for him.

It may be said that several of those testifying against the contestee on these matters freely admitted that they did so because, as they say, Cawood took Scott Gross' money and entered into an agreement with him, and then double-crossed him and used his own money against him.

Most of the evidence of the contestee's personal activities centers around one of the precincts at Black Mountain, which apparently is quite, if not altogether, one of colored voters. Twelve or fifteen witnesses, three of them deputy sheriffs, testified to seeing the open, bold purchase of votes by the contestee himself. These witnesses all testify that Cawood would give marked sample ballots to some of the voters as they entered the polls, and as they came out would receive those sample ballots and hand them some money. In many instances a challenger at the polls would nod his head to Cawood before he handed the money to the voter. When he would shake his head negatively, the voter did not interest Cawood. The deputy sheriffs, James Daniels, John Tyree, and W. S. Allen, admittedly were bitter partisans and earnest workers for the contestant. The fact that they stood by all day and beheld, as they testify, this orgy of vote-buying and bribery without undertaking to perform their duty as conservators of the peace, condemns their testimony, and little credence can be given it. Their only excuse for not acting is that it would have precipitated a riot. Surely, the arm of the commonwealth was not powerless.

R. F. Safreit, who identified himself as a worker for a candidate for another office at the Shields precinct, and whose credibility is in no way assailed, testified that that afternoon Cawood came to that precinct and said that he had an awful experience at Black Mountain that morning; that he had a bunch of negroes lined up two deep, and started at the head of the line giving them tickets and telling them what he would give for their vote. Some fellow started after him at the head of the line, and offered them more money, and he had to turn and go back and raise the price, and that he spent about $800 there before dinner. Contestee admitted having a conversation with Safreit, but denied that he made the statements attributed to him. Two other witnesses undertake to support the contestee.

The appellee specifically denied the charges of bribery at Black Mountain. He says that he did hand out sample ballots and receive them back; that he had only $35 in his pocket, and gave no money to any one, except $2 to a negro, Williams, to break up a crowd of negroes which had been corralled the night before to be voted against him, and that he bought some "pop." It appears there was a bodyguard of seven or eight men accompany-

ing Mr. Cawood at the Black Mountain polls, because it was thought that an effort would be made to run him away. Several of these men admit that they were armed. One of them was a deputy sheriff. These men say they were close by Cawood during the whole time he was at that precinct (which was until about noon, when it seems the ballots gave out), and deny that Cawood paid out any money to the voters. A few negroes, whose names were mentioned as having received money, denied the charges, but many of these were greatly weakened under cross-examination.

At the Shields precinct, Safreit testified that the contestee took probably 50 voters, one or two at a time, down to a little barn nearby after they had voted, having talked with them individually just before they entered the polls. This was denied, and there was some proof that during the day the owner of the barn locked it up, because it was being used as a place for buying votes. This evidence was introduced in behalf of the contestee, and it was said that it was others than he who was so using the barn.

We need not review the evidence of the irregularities in conducting the election at other precincts, for they become immaterial under the conclusion reached in the case.

From this maze of contradictory evidence, some difficulty is experienced in arriving at the truth of the matter. This not being a criminal proceeding, it is not required that the charges should have been proved beyond a reasonable doubt. Duff v. Salyers, 220 Ky. 546, 295 S. W. 871. Without analyzing our deductions from the contradictions, or stating the several reasons controlling the decision, it is sufficient to say the court concludes that the contestee violated the provisions of the Corrupt Practice Act (section 1565b1 et seq., Ky. Stats.), and that it was violated by his agents and representatives with his knowledge. Therefore, under the now well-settled law, he should have been and must be deprived of the fruits of his apparent and prima facie victory. Section 1565b-11, Ky. Stats.; Charles v. Flanary, 192 Ky. 511, 233 S. W. 904; Mellon v. Goble, 210 Ky. 711, 276 S. W. 830; Tackett v. Mayo, 211 Ky. 30, 276 S. W. 974; Duff v. Salyers, 220 Ky. 546, 295 S. W. 871.

Many eloquent and forceful statements have been made as to the sanctity of the ballot and the disastrous consequences to our institutions which may follow its corruption. The purity and freedom of elections are funda-

830

mental in a republican form of government. The contestee and Grant Gross are justices of the peace of Harlan county, and other officers and candidates are involved in the irregularities proven in this case. We have before us the written confession of the contestant himself that the law was violated in his behalf with his knowledge; hence that he is unworthy of the nomination, although we do not have the details of such infractions. The record discloses conditions disgraceful and reprehensible. There have been apparently flagrant violations, not only of the election laws, but of those pertaining to the duty and obligations of peace officers as well. Bribery, perjury, false swearing, and the obstruction of public justice and other criminal offenses run throughout the record.

The judgment is reversed, with directions that it be set aside and another entered, canceling and holding for naught the certificate of nomination awarded appellee.