## Douglas v. Greene.

(Decided October 11, 1929.)

HENRY WATSON, VIRGIL CHAPMAN and E. C. O'REAR for appellant.

JOHN G. WINN for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

In the primary election held on August 3, 1929, the appellant, Lindsey Douglas, and the appellee, Keller Greene, were the opposing candidates for the Democratic nomination for county clerk of Montgomery county. On the face of the returns, the appellant received a majority of the votes, and in due course of time was awarded the certificate of nomination. Thereupon the appellee brought this contest, in which, along with other grounds, he alleged a violation of the Corrupt Practice Act (Ky. Stats., sec. 1565b1 et seq.) on the part of the appellant and on the part of others for him with his knowledge. The appellant's answer was a traverse of the appellee's grounds of contest and a counter contest based on violations of the election laws and Corrupt Practice Act by appellee and others for him with his knowledge, such as appellee had asserted, of appellant and his workers. On the issues thus formed, the parties went to trial. At the conclusion of the contestant's proof, which showed beyond a peradventure of a doubt violations of the Corrupt Practice Act by the appellant and by others for him with his knowledge, appellant conceded that under the Corrupt Practice Act he was not entitled to the certificate of nomination. See Kentucky Statutes, sec. 1565b11. He stated, however, that he proposed to show that the appellee was likewise guilty of such violations, and hence not entitled to the certificate of nomination. Appellant thereupon took his proof, which we shall later discuss in detail. At the conclusion of the evidence, the court held that it had not been shown that the appellee had in any wise violated the Corrupt Practice Act and that the violations of that act which had been committed by his workers had not been shown to have been done with the knowledge of the appellee. The court therefore declared the appellee entitled to the certificate of nomination. From this judgment appellant appeals.

He has two grounds for reversal: First, the violations of the election laws against open voting, bribery of voters, illegal voters, and the like, were established to such an extent that, if such illegal votes are eliminated from the number of votes appellee received, the number of votes remaining to him would be less than two-thirds of the total vote cast. With this premise, and relying on a line of cases which he asserts holds that, where 20 per cent of the votes cast are thown out on a contest, the court will declare "no election" (cf. Green v. Ball, 216 Ky. 563, 288 S. W. 309), appellant argues that the court must in this case declare "no election." It must be frankly stated that, if this were a regular election instead of a primary election, we would not hesitate to hold that no legal election so far as the race here in question is concerned was held in Montgomery county on August 3d. There are nineteen voting precincts in Montgomery county. In seventeen of these precincts about every statute designed to preserve the purity of elections was flagrantly violated. Some precincts were of course a good deal worse than others. There was spent for both contestant and contestee in the purchase of votes a very large amount of money, and in some of these precincts the evidence shows that such purchase of votes ran to a very high percentage of the total vote cast. This is notably true of the Jeffersonville precinct. As so often happens where the purchase of votes reaches any proportions, open voting upon the table without the voters being sworn as to their disabilities was resorted to, no doubt to insure that the voter had voted as he had contracted to do. Officers accompanied the voters into the voting booths. In one particular instance where the polls were held in a boxed house, a strip was torn off the house leaving a crack through which those on the outside could look. A voting booth without curtains was backed up to this crack and the voter voted in plain view of those on the outside who might be watching him.

Without going into any further detail, enough has been said to show the character of election held on that day. However, this court has held in a long line of cases, Pflanz v. Foster, 155 Ky. 15, 159 S. W. 641; Kash v. Hurst, 189 Ky. 233, 224 S. W. 757; Taylor v. Weir, 155 Ky. 72, 159 S. W. 646, that in primary elections this court has no power to declare the election void (save possibly in those cases where it is shown that all the candidates have violated the Corrupt Practice Act), but is limited to

deciding whether the contestant or contestee is the party nominee. The candidate who receives the most legal votes must be declared the party nominee, and, if he has violated the Corrupt Practice Act or it has been violated by others in his behalf with his knowledge, then the candidate who has not violated that act or in whose behalf the act has not been violated by others with his knowledge who receives the next highest legal vote must be awarded the nomination. Pflanz, Kash, and Weir cases, supra; Kentucky Statutes, sec. 1565b11. It is not denied in this contest that the appellee did receive a large number of legal votes, and, as the appellant is not entitled to the certificate of nomination on account of his admitted violations of the Corrupt Practice Act, the appellee is entitled to such certificate provided he is not debarred on account of violations of the Corrupt Practice Act by him or by others in his behalf with his knowledge.

This brings us to the second contention of the appellant. At the outset of the discussion of this branch of appellant's case, it must be stated that it was overwhelmingly established that the election workers of the appellee violated the Corrupt Practice Act in the wholesale purchase of votes in at least thirteen out of the nineteen precincts of Montgomery county. The record fails to show, however, any direct violation of that act by the appellee himself. This much appellant concedes. As appellee is responsible for what his workers did only if done with his knowledge (see Kentucky Statutes, sec. 1565b11), we are next confronted with the question whether the violations of the Corrupt Practice Act on the part of his workers so clearly established by the record were done with appellee's knowledge. It was shown that the following men who worked for appellee at the polls and elsewhere had used money for purposes forbidden by the Corrupt Practice Act. John D. Henry, Vernon Kindred, Fred B. Ramsey, Buck Carrick J. L. Faulkner, Hayden Reynolds, John Harvey, Wm. Cochran, James Hammonds, E. B. Quissenberry, Floyd Wills, Newt Duff, C. E. Duff, Walter Bridges and Ralph Greene. Every one of these witnesses testify that the appellee did not know of their spending money for him in forbidden ways or otherwise on election day or at any other time. Most of them say that they had never discussed the question of money with the appellee or heard him mention it. Many of them testify that the appellee had distinctly stated that he had no money to spend, that he did

not intend "to spend a dime," and that he did not even make any promises about his race. Some of them never talked to him, they having been enlisted in the campaign by C. E. Duff, of whom we shall speak more later on; that if they had any conversation with the appellee it was one in which he only solicited their vote and their support in his race.

At this point it may be well to state that appellee testified that he knew nothing about the spending of any money in his behalf; that he had no money to spend; that he had determined not to spend any; that he had made no promises; and that he did not learn of the money which had been spent in his behalf or that had been raised for him until after the election. Of these men whom we have listed and who worked for the appellee, Newt Duff, had been formerly a partner in business with the appellee and was his close personal friend. C. E. Duff is a brother of Newt Duff and one time sheriff of Montgomery county, prominent and a powerful political factor. Ralph Greene is the brother of the appellee, and Walter Bridges is his brother-in-law. It was shown that most of the money that the workers received and spent for the appellee was given to them by C. E. Duff and he testified that he got it from Mr. W. B. White. Some effort was made in the record to show that White and Duff were campaign managers for the appellee. All three deny this. Mr. White, in substance, testified that he was not the manager of appellee's campaign, although he was his warm supporter; that a short while before the election he realized the appellee, who had no money, would need some, for "organization expenses," and thereupon he got in touch with Ralph Greene and suggested to him that they call upon two other brothers of the appellee, L. D. Greene of Louisville, Ky., and Sam Greene of Boston, Mass., for contributions. This Ralph Greene did, and these two brothers between them contributed $400 towards their brother's election expenses. This money was sent by checks payable to Ralph Greene. He cashed them and turned the money over to W. B. White, who later passed it out either directly or through C. E. Duff to the workers. Greene and White however, testify that all this was done without appellee's knowledge. Appellee testified that the first he heard of these contributions was when his brother Ralph Greene told about them on the trial of this case. It is plain from the record, however, that this $400 by no means covered all the money

spent for the appellee. The difference between this sum and the total amount (about $800) proved to have been spent for the appellee was shown to have come partially from small contributions by Mr. White, Floyd Wills, Fred Ramsey, and C. E. Duff, and from a rather large contribution by Mr. Quissenberry, but there is still a balance of about $200 unaccounted for.

The appellant, while admitting he did not directly prove knowledge on the part of appellee of what those who were supporting appellee were doing, yet insists that he did establish such knowledge by the circumstantial evidence adduced. Outlined, that evidence is this: The appellee was an experienced politician. He had served before in the office of county clerk. He knew the conditions in Montgomery county which are claimed to be such as to require the use of money not entirely for legitimate purposes on the part of successful candidates; that he was optimistic in his race; that he well knew his opponent to be resourceful and with money at his command; that it is preposterous to think that his brothers and brother-in-law raised the money they did and spent it in the fashion they did without appellee knowing something about it; that it is not shown that he forbade his brothers to raise or spend money illegitimately for him; that it is shown that he actually solicited the support of W. C. Sebastian and that when the latter, coy at first, at last agreed to work for him he told Sebastian to see Mr. C. E. Duff; that Sebastian did go to see Duff, and that, in their conversation, appellee not being present, they unanimously agreed that money would be needed in the Jefferson precinct where Sebastian proposed to work; that Duff took him to see White, appellee not being present, and White gave him some money which White told him had been raised "by the good people of Montgomery county to help elect appellee;" that Sebastian took this money and used it in the purchase of votes; that C. E. Duff as well as W. B. White were very active in appellee's behalf, and hence that he and White must have been appellee's campaign managers; that on election day appellee, although he did not work at the polls, did visit the polls at which Newt Duff was working and inquired of him how things were getting along,, and that Newt Duff told him, "I was doing all I could do; I was trying to run in all the votes I could for him;" that the precinct at which Newt Duff was working was one where a large number of votes were purchased; that appellee also vis-

ited the precinct at which Floyd 'Wills was working and inquired of him how the election was going on, and this although appellee in his testimony deposed that he did not know that Floyd Wills was working for him at the polls; that this precinct too was one where votes were purchased; that appellee was careful to file his post-election statement with the sheriff of Montgomery county on the same day he filed this contest proceeding, from which it may be fairly deduced that he did so in order that he might be able to swear that he had no knowledge of any money having been spent in his behalf, before the facts were brought out in this contest proceeding. Appellee testified that he filed his statement when he did, not for the reason asserted by appellant, but because his counsel had advised him he would have to do so in order to be entitled to a certificate of nomination.

'We believe that we have fairly outlined the evidence on which appellant relies to show knowledge on the part of the appellee of the violations of the Corrupt Practice Act on the part of his workers. It is true that we have held that the knowledge called for by the Corrupt Practice Act may be established by circumstantial evidence. Charles v. Flanary, 192 Ky. 511, 233 S. W. 904; but the evidence should do more than merely raise a suspicion, even though the suspicion be strong, that the candidate knew of such violations. Napier v. McIntosh, 220 Ky. 539, 295 S. W. 856; Duff v. Salyers, 220 Ky. 546, 295 S. W. 871; Burchell v. Hubbard, 218 Ky. 344, 291 S. W. 751. The facts of this case are no stronger than those in the Napier and Duff cases, supra, where we held that "knowledge" on the part of the successful candidates of violations of the Corrupt Practice Act by their workers had not been established. It is well known that in many elections, supporters of candidates go to extreme lengths to elect their candidates and do many things which the candidates themselves would not have countenanced had they known of them. Especially is this true where there is a factional fight in the political party of the candidate as this record strongly indicates was the fact here. While it may seem strange that the appellee did not know of the raising of the campaign fund by his brothers, and while all the circumstances we have detailed, especially that of the appellee referring Sebastian to Duff, may raise a very strong suspicion of appellee's knowledge of what was going on, yet, when all this is taken in the light of the sworn testimony of appellee and of all of these work-

ers, to the effect that appellee knew nothing of their violations in his behalf of the Corrupt Practice Act, we are constrained to hold that the circumstances relied upon by the appellant fall short of the proof of that knowledge necessary to deprive the appellee of the certificate of nomination awarded him.

This being so, the judgment of the lower court is affirmed.

Whole court sitting.