## Hogg v. Combs.

## Combs v. Hogg.

(Decided Sept. 26, 1933.)

HOGG & MOORE, JESSE MORGAN and LEWIS E. HARVIE for Hogg.

NAPIER & EBLEN and STEPHEN COMBS, Jr., for Combs.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
.Reversing in part and affirming in part.

Having received a majority of 59 votes in the recent August primary, J. Harvey Hogg was given the Republican nomination for sheriff of Letcher county. His opponent, Stephen P. Combs, contested the election upon the ground that he had violated the Corrupt Practice Act (Ky. Stat., sec. 1565b-1 et seq.) .and that the ballot boxes in certain precincts had not been promptly returned. Hogg filed a counter contest. The trial court held that neither candidate was entitled to the nomination and that there was no election. Section 1565b-11, Kentucky Statutes. Both parties appeal.

The contestee raised the issue that the contestant was ineligible for the office and ineligible to have his name placed on the ballot because he had not been a legal resident of the county for one year next preceding the election (Constitution, sec. 100), and therefore, was not entitled to the nomination, nor in position to maintain the action questioning his nomination. This issue presented questions of fact and of law. However, the conclusion we have reached on the merits of the charge against the contestee obviates a decision on that issue. Let it be conceded arguendo, without being decided, that the contestant's position is sound, that the question of eligibility for the office cannot be raised in an election contest, and the contestee was relegated to another exclusive remedy in respect to questioning the right to have his name on the ballot. See Potter v. Campbell, 159 Ky. 328, 167 S. W. 404; Francis v. Sturgill, 163 Ky. 650, 174 S. W. 753; Hardin v. Horn, 184 Ky. 548, 212 S. W. 573; Whitney v. Skinner, 194 Ky. 804, 241 S. W. 350; Combs v. Dixon, 215 Ky. .566, 286 S. WW. 797; Wheeler v. Patrick, 192 Ky. 529,

233 S. W. 1054; Greene v. Cawood, 230 Ky. 823, 20 S. W. (2d) 984; Faulkner v. Asher, 221 Ky. 272, 298 S. W. 691; Kirby v. Creech, 235 Ky. 816, 32 S. W. (2d) 419; Halteman v. Grogan, 233 Ky. 51, 24 S. W. (2d) 921.

We proceed to the evidence tending to prove that Hogg had violated the Corrupt Practice Act, or it had been done by others in his behalf with his knowledge. Section 1565b-11, Kentucky Statutes.

Much of the testimony was exploratory and proved nothing. We look first at instances which Combs argues prove a personal purchase of votes by Hogg.

Charles Henry testified that Hogg gave him $2 on the street on the day of the election. But on cross-examination he clearly explained that this was for the use of his automobile in advertising a barbecue held two or three weeks before election in accordance with an agreement then made with a group of candidates; the sum paid being Hogg's share. On the day of the election, the witness drove his car for the contestant, Combs, for which he received $10 the morning before the election. This proves nothing against Hogg.

Martin Wright testified that he did not know Hogg personally, but on Thursday or Friday night before the election he had given him $10 to vote for him and to get his folks out. His brother, Ben Wright, undertook to corroborate him, but they did not quite agree on some of the particulars. Wright made an affidavit that he had voted for Hogg, but testified on the trial that he did not vote because he was a Democrat, and that he had never promised Hogg to do what he was asked to do. The impeachment of these witnesses by a number of substantial citizens was not controverted. The sum claimed to have been paid by Hogg was ten times what seems to have been the market price of votes that day. The testimony of these two men, taken as a whole, is not convincing. Hogg denied positively and unequivocally the entire transaction.

Howington testified to having seen Hogg and a negro, Joe Mitchell, in conversation on the street and heard something rattle, which he took to be silver money, and which was handed to the negro. He joined some others across the street and all went toward the depot where he was employed as a porter. This was

in a direction away from the polls. A number of people were standing around, but none other testified. Mitchell and Mr. Hogg denied this.

Willard Gibson said that about a week before the election, while he was with Ezra Everage, he asked Hogg for some money with which to buy whisky during the election, but did not get much satisfaction. Then Hogg and Ezra went into a hotel, and the latter returned and brought him a $5 bill and had another for himself. He could not say whether Hogg asked him to vote for him or not. There is some discrepancy in the testimony of the men; e. g., Everage testified that Hogg said to them without being asked that he was going to loan them $10, and emphasized that it was only a loan. Gibson says he bought whisky with the money. When asked if he electioneered for Hogg, he answered, "I went my feelings in different races," but did not vote in the election because he was a Democrat. The reputation of both witnesses is bad. Hogg denied the entire transaction.

Notwithstanding their explanations and denials, it was pretty well shown that the contestee's brother and several other workers for him, particularly Leonard Hopkins and Jack Max, were guilty of buying votes. Some of them handed out cards bearing Hogg's name and the names of candidates for certain other offices. Some of the voters so approached by these men were asked to vote for only one of those candidates and not Hogg. The only scintilla of evidence tending to prove that this was with the knowledge of the contestee was that he was seen talking with Hopkins during the day. So was Combs, his opponent. Hopkins says that Combs offered him $40 for his services that day, which he refused. An effort was made to prove that Hogg had these cards printed, but it was developed that another person interested in another candidate had done so. Hogg insists that this was done without his acquiescence and that he objected to the combination of names when he found out what was going on because he did not want to antagonize the several opponents of the candidates listed with him on these cards.

The sheriff at one of the polls came outside of the voting place and indicated on sample ballots how some should vote and perhaps on one or more occasions designated the contestee. An officer had gone away from

the polls for perhaps an hour. Though highly improper, these acts, without more being shown, could not affect the contestee's right to the nomination. Nor can we see any merit in a similar contention that some of the voters entered a schoolhouse through a window where the election was being held instead of entering by the door around which there was then a considerable crowd. Guilt of a conspiracy to violate the law is attached to the contestee from the fact that a short while before the election he and some others, including a candidate for county judge whose name was listed with his on the cards distributed, had signed as surety a small note of an outstanding leader of the colored people in the community, which had been used to pay for an automobile. It is claimed that this was a potent circumstance showing a conspiracy between the men, but there is no evidence of any overt wrongful act by any of them. Suspicion is also cast upon Hogg by his opponent because his brother borrowed $500 from a bank a week or more before election which he then said was to pay off a debt at another bank and for which he deposited some collateral standing in the name of his mother. It was not undertaken to show the purpose for which the money was said to have been obtained was untrue.

This is all the evidence against the contestee. Everybody realizes the difficulty in proving charges of this nature. On the other hand, it is not always a difficult thing to obtain an unscrupulous person to testify falsely that the candidate bought his vote. It is true that bribery by the candidate himself or by others with his knowledge may be proved by circumstances and that guilty knowledge may be inferred from those facts. It is likewise true that such evidence must transcend mere suspicion and that there must be a reasonable inference of guilty knowledge. Manning v. Lewis, 200 Ky. 732, 255 S. W. 513; Douglas v. Greene, 231 Ky. 44, 20 S. W. (2d) 1026; Baker v. Gross, 231 Ky. 51, 21 S. W. (2d) 138; Asher v. Broughton, 231 Ky. 165, 21 S. W. (2d) 260; Howard v. Cockrell, 231 Ky. 278, 21 S. W. (2d) 455.

There was neither pleading nor proof that the ballots or the boxes which were not returned to the clerk's office on Saturday night immediately following the election had been in any way molested. The evid-

ence is that they came from very remote sections of Letcher county and that at least in one instance it was necessary to travel thirty or forty miles through Harlan county in order to reach Whitesburg and deliver the boxes. On the other hand, the integrity of the boxes and ballots was sustained without any effort being made to overcome that evidence. Although in many if not all of these precincts the contestee received a majority, we find nothing in this contention which authorizes the court to invalidate the returns of those precincts. See Raymer v. Willis, 240 Ky. 634, 42 S. W. (2d) 918.

The contestee may be guilty of having obtained this nomination with the improper use of money and in violation of the law, but the case must be tried upon the record. Its very careful consideration leads to the conclusion that the contestant did not sustain the burden he assumed of proving such facts as would authorize the court to deprive the contestee of his certificate of nomination.

Wherefore the judgment is reversed on the appeal of J. Harvey Hogg, and affirmed on the appeal of Stephen P. Combs and on his cross-appeal. The contestant's petition should be dismissed and judgment rendered accordingly.

Whole court sitting.