## Phillips v. Langford.

(Decided Oct. 10, 1933.)

(Rehearing Denied Oct. 24, 1933.)

H. C. KENNEDY for appellant.

WALL and LEWIS for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—Reversing.

At the primary election held on August 5, 1933, J. S. (Tip) Langford, C. W. Phillips, and about 20 others were candidates for the Republican nomination for jailer of Rockcastle county. The canvass and tabulation of returns showed a small majority for Phillips over Langford, who received the next highest number of votes; however, the election commissioners refused to count 16 ballots marked for Langford in the New Scaffold Cane precinct No. 6 because they were not signed on the back by a judge of the election. A certificate of nomination was issued to Phillips.

On August 15, Langford instituted this action in the Rockcastle circuit court contesting the election of Phillips, and after setting up his qualifications for the office and his compliance with the provisions of the statute relative to steps necessary to have his name placed upon the ballot and the filing of his expense accounts,

he alleged that he received a higher number of legal votes than any other candidate for the nomination and was, in fact, nominated and entitled to the certificate of nomination for jailer, but that the election commissioners had failed and refused to count a number of ballots cast for him because such ballots were not signed on the back by one of the judges of the election; and especially set up the failure to count the ballots in the New Scaffold Cane precinct because not properly signed by a judge of the election. He alleged that these ballots were legal and should have been counted for him. He asked for a recount and that all ballots cast in the election be counted, regardless of whether they bore the signature of one of the judges of the election; that he be adjudged to have received the nomination and that a certificate be issued to him; that the certificate of nomination issued to Phillips be canceled and held for nought.

Without waiving a demurrer to the petition, contestee, Phillips, filed answer, the first paragraph of which was a general denial of the allegations of the petition, and in a second paragraph by way of counter contest, after setting up his qualifications and his compliance with the provisions of the statute relating to primary elections, alleged certain illegal votes cast for contestant in various precincts and counted by the election commissioners should be deducted from the votes counted for him. Included in this list of alleged illegal votes were the names of a number of voters whose ballots were marked by the clerk of the election in the presence of the election officers and others, without compliance with the provisions of the statute relating to voters who because of blindness, physical inability, etc., were unable to mark their ballots.

On August 19, contestant filed another petition in the same court and, after reiterating, in substance, allegations of his former petition, alleged certain voters who were not qualified to vote in the primary cast their votes for contestee and that their votes should be deducted from votes counted for him and further that contestee had violated the Corrupt Practice Act (Ky. Stats. sec. 1565b-1 et seq.), in that he had issued orders to a number of designated voters and to others unknown in various amounts ranging from $3 to $5 directed to merchants, which orders were received and

580

paid by the merchants; that these orders ostensibly were for work to be done for the county on the roads but that no such work was done, and the orders were given for the purpose of influencing and bribing voters to vote for him; that such orders and money paid and given to such voters did influence them to vote for contestee, and he prayed for relief accordingly.

In addition to a plea in abatement, contestee by answer traversed the allegations of the second petition and affirmatively set up practically the same grounds of counter contest as contained in his former answer. The issues were completed by reply denying the affirmative allegations of the answer and by the motion of contestant, and over the objections of contestee, the actions were consolidated. It was stipulated and agreed by the parties that upon a recount of ballots in the New Scaffold Cane precinct, 15 ballots had been voted for contestant which had not been signed on the back by either judge of the election, and that one ballot had been cast for him which had not been signed on the back by the clerk; that the court ordered all of these ballots to be counted for contestant and that they were included in the total number and went to make up his total of 465 as counted by the court.

On final hearing it was adjudged that the votes of Arthur (Mod) Mullins, Emily Mullins, Ed Carpenter, and Breve Allen, cast for contestant in the Crooked Creek precinct, were illegal because these voters voted on the table in the presence of the officers without being sworn as required by law, and that the vote of Lydia Gray cast in the Orlando precinct for contestant was illegal for the same reason; that these 5 votes should be deducted from the total number of votes counted for contestant. When so deducted, it was adjudged that contestant received 460 legal votes and that contestee received 464 legal votes, but it was further adjudged that contestee had violated the Corrupt Practice Act and therefore was not entitled to a certificate of nomination; that contestant had not violated the Corrupt Practice Act, and having received more legal votes than any other candidate seeking the nomination except contestee, he was entitled to the nomination and the election commissioners were directed to issue him a certificate of nomination.

Contestee is appealing, and is urging a number of

grounds for reversal; but since contestant has not prosecuted a cross-appeal and does not call in question the correctness of the judgment with respect to the 5 votes deducted from the total cast for contestee because the voters marked their ballots in the presence of election officers, the conclusion we have reached regarding the chancellor's holding that contestee violated the Corrupt Practice Act obviates the necessity of giving consideration to other grounds argued by counsel for contestee.

It appears in evidence that contestee was a justice of the peace and the fiscal court had voted a fund for relief of the unemployed and needy which was apportioned to the various magisterial districts of the county. The justices of the peace were permitted to give orders to be paid out of the fund appropriated for their respective districts, and contestee had given a number of such orders to various persons. While we cannot go into full detail as to the evidence bearing on the question of alleged violation of the Corrupt Practice Act, we shall give a brief summary of the evidence on that point.

Contestee is a resident of Crooked Creek precinct and was at the voting place in that precinct practically all day of the election. Walter Mullins testified that he saw Phillips with a roll of money and heard him say to Arch Anderson, "Here is money for your wife and that order ought to take care of you." Arthur (Mod) Mullins testified that contestee pulled out a roll of money and asked witnesses what they would take to vote for him, and Virgil Mullins' evidence was in effect the same as that of Walter Mullins. C. L. Allen testified that he was paid $2 by contestee to vote for him. Martin Allen testified that he saw contestee with a roll of $1 bills in his hand and that contestee paid him $2 for his vote. Taylor Griffin testified that he saw contestee give Arch Anderson $1 and heard him say something about fixing the balance but heard nothing about an order. Esmer Issacs stated that about four or five weeks before the election, contestee asked him if he was going to vote, and said if he would take his wife and vote for him, he would make it worth his while. Mrs. Elizabeth Nichols, who voted for contestee, testified that he gave her an order for $2 some time before the election; that her family was on the list of those entitled to receive help

and that nothing was said about the election in connection with the order.

Contestee denied in toto the statements of these witnesses with reference to his giving, or offering to give, money to them or to others and testified positively that he did not use any money or give any orders to influence any voter or voters. He stated that something like two weeks before the election he borrowed $150 from the bank and placed $50 of this on deposit and used it to pay interest on notes against him held by one Mr. Sparks of Jackson county; that he paid to his mother money borrowed to defray expenses of his campaign and paid Bill Davis for advertising and other campaign expenses and out of the remainder had paid $25 to his attorney in this action.

Arch Anderson testified that he saw contestee on the day of the election mixing with the crowd; that contestee did not give him any money whatever and that he did not see him with money; and that contestee did not give him money for his wife nor say that the order would take care of him (witness). He testified that about a year before when his boy was ill with typhoid fever, contestee gave him an order of $3 which was paid by Mr. Burnett; that the county paid the doctor for attending his son. A number of witnesses who were in the voting place during the day of the election testified that they saw contestee walking around talking to voters but did not see him with money in his hand or giving it to others.

The evidence of a number of witnesses strongly tends to impeach and discredit the three Mullins boys and other witnesses who testified as to contestee giving or offering to give money to voters, it being shown that their reputation for truth, veracity, and morality was bad; and it is further shown that Arthur Mullins had served a term in the penitentiary for arson. Two or three witnesses who live at Mount Vernon, eighteen or twenty miles from the Crooked Creek precinct, testified that they never heard Walter Mullins' reputation as to truth, etc., called in question, but that they had not been in touch with Virgil for the past eight or ten years.

In rebuttal, contestant introduced John A. Griffith, who stated that contestee said he would give him and his wife $2 if they would vote for him and that he had

some money in his hands. This was denied by contestee, and there is evidence that the reputation of this witness for truth and morality is bad.

Summing up, two witnesses testified that contestee paid them $2 for their vote. There is evidence that he handed one or two dollars to a voter and said it was for the latter's wife and that he would take care of the balance or that the order would take care of it. Two or three witnesses testified that contestee offered them money to vote for him. On the whole, the evidence of the character witnesses and the circumstances revealed by the record strongly tend to impeach and discredit the witnesses who testified as to use of money by contestee.

In the recent case of Hogg v. Combs, 250 Ky. 400, 63 S. W. (2d) 465, decided September 26, 1933, a judgment holding Hogg to be guilty of a violation of the Corrupt Practice Act was reversed where there was practically as much evidence to show a violation of the act as there is in this instance. In that case as in this, the witnesses who testified as to use of money by Hogg were discredited and impeached by other witnesses and by proven facts and circumstances. In the course of the opinion, it is said: "Everybody realizes the difficulty in proving charges of this nature. On the other hand, it is not always a difficult thing to obtain an unscrupulous person to testify falsely that the candidate bought his vote. It is true that bribery by the candidate himself or by others with his knowledge may be proved by circumstances and that guilty knowledge may be inferred from those facts. It is likewise true that such evidence must transcend mere suspicion and that there must be a reasonable inference of guilty knowledge. [Citing cases.]"

As evidenced by former opinions, this court, recognizing the salutary purposes of the statute prohibiting the corrupt and unwarranted expenditure of money to control an election, has not hesitated to uphold and rigidly apply it, and we would not hesitate to do so in this instance if we could with any assurance or feeling of certainty that there had been a violation of its provisions.

Ordinarily, candidates purposing to corrupt elections do not confine their activities to two or three

witnesses in one out of many precincts. It is also significant that except as recited there is no evidence or facts or circumstances in evidence corroborating the witnesses who testified that contestee used or offered to use money to bribe voters.

A candidate should not be deprived of a nomination or election at the hands of the people because of alleged violation of the act in question unless evidence of probative nature and value tends to show such violation.

In view of the proof concerning the credibility of witnesses introduced to sustain the allegations as to use of money to corrupt and bribe voters and the lack of corroborating facts and circumstances, we conclude that the judgment of the chancellor does not find sufficient support in the evidence.

Judgment reversed, and cause remanded for proceedings consistent with this opinion.

Whole court sitting.