## Broughton v. Ridings et al.

## Rhea v. Same.

(Decided Feb. 24, 1933.)

MARTIN T. KELLY and W. L. HAMMOND for appellant Mrs. M. E. Broughton.

JAMES M. GILBERT and JAMES S. GOLDEN for appellant Frank Rhea.

N. R. PATTERSON and J. HENRY TAYLOR for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Reversing.

Mrs. M. E. Broughton and Frank T. Rhea were unsuccessful in a contested election case involving the right to the office of sheriff of Bell county, and they have appealed.

At the election held on November 8, 1932, James W. Ridings was the candidate on the Republican ticket, Frank T. Rhea upon the Democratic ticket, Ed. Garland upon the Communistic ticket, and Mrs. M. E. Broughton upon the Independent ticket. See Broughton v. Pursifull, Clerk, 245 Ky. 137, 53 S. W. (2d) 200.

The election board founa these candidates had received the follownig votes: Ridings, 4494; Rhea, 4432; Mrs. Broughton, 1421; and Garland, 61.

On November 16, 1932, Rhea filed a contest namirg all of his opponents and the board of election commissioners as defendants, asking for a recount of the ballots, charging Ridings with violation of the Corrupt Practice Act (section 1565b-1 et seq., Ky. Stats.) in divers ways all meticulously detailed, and alleging that he (Rhea) had not violated the Corrupt Practice Act.

He gave bond as required by section 1596a-12, as amended (see chapter 51, Acts of 1930), asked for a recount of the ballots in certain precincts, that Ridings be adjudged guilty of violating the Corrupt Practice Act, that his election be declared void, etc. Mrs. Broughton filed a similar contest on the same day asking for similar relief. A recount of the ballots made but little change in the result; Ridings lost three votes, and Rhea gained one.

The two contests were consolidated and heard together. The hearing began at a night session on Friday night, December 16, 1932. Ten witnesses were examined that night and the court adjourned over to Tuesday, December 20th. Eight of the witnesses examined at this night session testified Ridings had given them money to vote for him.

Napoleon could not have struck any quicker or more effectively than did Ridings. Six of these eight witnesses were arrested, upon charges of false swearing. A bondsman for three of these was found, he was an active supporter of Ridings, his nephew is the jailer, and he did not live near the men accused, but lived on the opposite side of the county.

The other parties arrested were thrown into jail, and at the next session of the court one of these was recalled and then testified he was mistaken about the man who had given him this money and that it was not Ridings. His wife was recalled and she made a similar recantation of her testimony. Three of the other four witnesses arrested were later recalled and then testified they had "lied" (that is the language they used) on their first examination and that Ridings had not given them money. Four of these five arrests were made by

Ridings himself. He admits making three or four of the affidavits on which warrants were issued.

Ridings was in a most favorable position to do what he did. Under the circumstances he could himself make arrests. As deputy jailer he was a peace officer. See section 26 of Criminal Code of Practice. The acting commonwealth's attorney was one of his counsel in this contest. The county attorney and county judge, while not appearing as counsel for Ridings, are shown to have been present at much of this trial and these officers were, to say the least, not unfriendly to Ridings.

The effect of the Napoleonic course pursued by Ridings was electrical. The whole countryside saw the power of the man and how ruthlessly he would exercise it. Not a witness was thereafter found who would swear positively and unequivocally that Ridings had given them money to vote or use their influence for him in the November election. Other witnesses were introduced, who perhaps had talked so much they were compelled to say Ridings had given them money for their votes or influence, but the memory of each of them was visibly affected and they were uncertain whether it was for the November election or the August primary.

Ridings knew these men could not be convicted of false swearing, for which every essential fact necessary to constitute guilt must be proven beyond reasonable doubt by two witness or one witness and strongly corroborating circumstances. See Botner v. Com., 219 Ky. 272, 292 S. W. 805, and cases there cited. In 15 Ky. Digest, Perjury, p. 327, still other cases to same effect may be found.

We will take the arrest of Bill Mason for example. There would be no difficulty in proving he had at this night session testified he had been given a dollar by Ridings to vote for him, but Ridings then knew he could not produce the evidence required under the authorities cited to prove this testimony given by Mason was untrue, and it is just as necessary to prove it was untrue as to prove that he so testified.

Ridings knew all this, he knew these men could not be convicted, and it would reasonably appear his purpose in instituting these prosecutions was to accomplish just what resulted, that is, to spread abroad such in-

timidation and terror that other and further testimony of this character could not be produced against him, and he succeeded in his scheme. The contestant Rhea offered to testify that he had summoned as witnesses reputable people who refused to come because of these warrants, prosecutions, and intimidations. He was not allowed to do so and that was put into this record by avowal.

Reviewing this evidence, we find that five of the six who were arrested recanted when recalled to the stand and said their former testimony was false. One of these incarcerated refused to recant and he was impeached by several witnesses who testified the reputation of the witness for truth and veracity was bad. One witness was found who testified to the bad reputation for truth and veracity of another of the eight, and as to the remaining one it is argued that her testimony is incredible and that she is a niece of Bill Bullock and of Mrs. Broughton and hence not to be believed.

Ridings denies giving money to these people, but he practically admits he is a vote-buyer. That admission is found in this:

After Ridings had inaugurated his reign of terror, Mr. and Mrs. W. R. Rose were called as witnesses and testified that Ridings and Camie Wilson came to their home in Coleman's camp, talked to them, and gave Mrs. Rose money and asked them to vote for him. Mrs. Rose said this was shortly before the November election, but on cross-examination became uncertain about the date and would not be positive whether it was shortly before the November election or the August primary. Mrs. Rose's testimony was the same; she says Ridings gave her the money, but she paid no attention to the time and would not say whether it was in the November election or the August primary. Ridings testified he visited Mr. and Mrs. Rose, but it was before the August primary, and then used this language: "I don't recall giving her any money there on that occasion." That very language shows he was either so much in the habit of buying votes that such a transaction made no impression on his mind, or else that he had in fact given Mrs. Rose money just as she testified and regarded this as the mildest way in which he could deny it. A man not accustomed to buying votes would have said: "No, sir, I never gave her any money of any kind." That is

natural and human nature is a part of the evidence in every record.

Mr. Camie Wilson was with Mr. Ridings at the time of his visit to the home of Mr. and Mrs. Rose, and these two questions and answers are taken from his evidence.

"Q. On that occasion do you recall whether or not Mr. Ridings gave either Mr. or Mrs. Rose any money? A. I didn't see him.

"Q. Do you now tell the Court Mr. Ridings didn't give Mrs. Rose a dollar? A. I said I didn't see him if he did."

The evasiveness of these answers makes them unimpressive. Mrs. Rose tells it this way:

"A. Yes, sir, he called me in the room and gave me a dollar and said not to forget him when I went to vote."

Here is the way her husband tells it:
"Q. Did you see him give your wife that dollar bill? A. I did."

Direct and pointed answers are more convincing than those of indirection. We believe he did give her money, and we believe he gave these eight witnesses money just as they said he did despite the fact that elsewhere Ridings testified he did not spend money or buy or influence votes in this election, and despite the fact that five of these witnesses recanted and said their first testimony was false. All of us should stand in respectful awe of the law, for it is the people's law, made by them to hold society together, to give us peace, to establish justice, to sustain the weak, restrain the strong and help all, to help each other, yet it often happens that the weak and lowly who need it most stand in constant fear of the law, and dread nothing more than to fall into its hands, and we should not view too critically their often misguided efforts to extricate themselves from its toils, and especially is this so when their plight is the result of the perverse action of the strong, as in this case.

So again we say we believe these witnesses, recanters and all. We know they swore at first that Ridings gave them money and later said he did not, and both of those statements cannot be true; but we prefer to be-

lieve what they said, before the reign of terror began, rather than what they said after they had suffered under it.

There is a great deal of evidence in this record about the activity of Wm. Hays, Charley Ridings, Camie Wilson, James S. Helton, and others in behalf of contestee Ridings, and it is charged in the contest filed that they and others agreed with each other and with contestee Ridings to furnish money, and that with the knowledge and consent of Ridings they did furnish money and purchased and bribed voters therewith in his behalf.

It is admitted that Hays, Wilson, and Helton all supported Ridings earnestly and energetically. We shall set out some of the activities of Wm. Hays. It is shown he traveled with Ridings over the county, attended speakings, and solicited votes. Mrs. Ollie Brown approached Mr. Ridings to see about running a transfer to bring voters to the polls, and Ridings told her to see Wm. Hays.

Wm. Hays on election day was at Arjay precinct. Charley Ridings was the sheriff of the election at that precinct. Oscar Roark testified he worked with Wm. Hays that day in that precinct, for Jas. Ridings in the sheriff's race. He says he would round up the voters and that Hays would tell them if they voted right Charley Ridings would nod his head, and that when the voters came out Hays would pay them 50 cents apiece, that they got them two at a time, and that he estimated Hays gave money to about 100 voters. Roark says he and Hays were working in the interest of the straight Republican ticket.

Ray Charles testified Hays gave him 75 cents to vote for Ridings. Harvey Warren testified Hays told him and Everett Johns to go in and vote the straight Republican ticket; vote for Jim Ridings; if Charley Ridings nods his head, we will give you the money when you come back. They did so, and were given 50 cents each by Hays after they came out. Other witnesses were to same effect. Charley Ridings does not testify.

Wm. Hays admits he was at Arjay precinct on election day "to solicit votes for the Republican ticket"; that he used about $35 but didn't buy votes for Ridings; he says, "I just handed it out to people in one dollar

bills where people called for some money to get something they wanted to get," and that he handed out money to "some 35 or 40 or something that way I guess." He admits that Oscar Roark worked with and conferred with him "a portion of the day," and admits he gave Roy Charles $1; that he gave this money to all these people "as a matter of charity." Witness also admits he had 50 or 60 one dollar bills at the election. Other irregularities were shown at other precincts.

As the facts in no two election cases are the same, each case is necessarily controlled by its own particular facts. In Douglas v. Greene, 231 Ky. 44, 20 S. W. (2d) 1026, we held the appellee Greene was ignorant of and not to be charged with what was done in his behalf by his friends, but Greene's conduct as set out in that opinion is very different from the conduct of Ridings as set out in this one. That was a border line case, but in this one Ridings got over the border, and from his own conduct we believe he was aware of what Charley Ridings, Wm. Hays, and others were doing and that this case falls within the limits of the case of Howard v. Cockrell, 231 Ky. 278, 21 S. W. (2d) 455. It is adjudged the election of Ridings is void for his violation of the Corrupt Practice Act.

Judgment reversed.

The whole court sitting.