## Murrey v. Kirkman.

(Decided October 22, 1929.)

(As Modified, on Denial of Rehearing, November 1, 1929.)

HUBERT MEREDITH, O. P. ROPER and EVERETT S. PENICK for appellant.

COLEMAN TAYLOR and PETRIE & STANDARD for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Affirming.

Appellant and appellee were candidates for sheriff of Todd county. According to the official count, appellee received 1,366 votes; appellant, 1,351. Appellant contested the election, charging that the votes had not been correctly counted, alleging that many illegal votes had been cast for appellant and also charging a violation by him of the Corrupt Practice Act (Ky. Stats., sec. 1565b1 et seq.). The issues were made up; the circuit court recounted the vote. The recount slightly increased appellee's majority. The circuit court then took up the question of illegal voting on both sides and his decision here also slightly increased appellee's majority. He held that no violation of the Corrupt Practice Act by appellee was shown, and dismissed the contest and that is the only ground relied upon for reversal.

1. The first transaction complained of is that the appellee, Robert T. Kirkman, gave Roy Lamb a second-hand automobile, worth about $75, for his support and influence in the primary, in consideration of which Lamb and his family did support Kirkman and delivered to him at least 15 votes. The only testimony in the record bearing on this transaction is the evidence given by Roy Lamb himself. In narrative form, it is that, about three or four weeks before the election Lamb approached Kirk-

man, who was in the automobile business, having an agency for the Chevrolet machine, and asked Kirkman to give him an old secondhand Ford touring car then in the storage room of Kirkman's garage. This automobile would not run, and is described by Lamb as being "junk." Lamb is not definite as to just when he spoke to Kirkman for the first time about his Ford. He says that it was before Kirkman had announced for sheriff, and that it was before he had heard any rumor of Kirkman being a candidate. He says that, some time after that, he heard of Kirkman going to run, and he asked Kirkman about it down at the depot, and Kirkman said that he did not believe that he would announce, as he was too busy. At all events, when Lamb asked Kirkman for the car, Kirkman told him that he would look at the junk cars when he got time, and Lamb told him that he could fix one up himself. Shortly after this, Kirkman told Lamb that he could have the Ford he had asked for. Lamb then went to work on the car and got it in condition to run. To do so, he worked on the car eight days and used secondhand parts from Kirkman's garage. After Lamb got through working on the car, he had to get a truck to pull the car up and down the street, in order to get it started. Lamb says that after he got the car so that it would run, it was worth about $75. Lamb is positive in his statement that at the time he asked Kirkman for the car, and when Kirkman gave it to him, nothing at all was said about the election, about Lamb's vote, or about Lamb working for him, but admits that, when he got the car so that it would run, Kirkman did ask him to work for him on election day, Lamb says he told Kirkman he would gladly do so, as Kirkman had been so kind to him. When asked whether he would have supported Kirkman, but for the fact that Kirkman had given him the car, Lamb said that he did not know; that he would have to study about that.

On the day before the primary, Lamb, after repeated requests, procured a bill of sale from the Kirkman garage, and had the car transferred to his name in the county clerk's office, and procured a license for it. On election day, he used the car in driving voters to the polls for Kirkman. He also voted for Kirkman. There were in Lamb's immediate family 14 other voters, and he admits that he asked them to vote for Kirkman. Appellant says that they did, but we can find no evidence in the record as to how they voted. It cannot be even said that it can be inferred from the record as to how they voted,

for, when questioned about his father and mother, he said that he asked them to vote for Mr. Kirkman, and they said that "they would study about it." As Lamb's father-in-law drove a car for Mr. Kirkman on election day, it is maybe fair to assume that he voted for Mr. Kirkman. On August 16th, and after this contest was filed, Mr. Cartright, who worked for Mr. Kirkman in the automobile business, got Mr. Lamb to sign a paper, the contents or purport of which Lamb says he did not know, but which turned out to be a mortgage on this Ford car, running to Kirkman, in the sum of $50. Kirkman put this mortgage to record.

There is nothing in the transaction as thus related by Lamb to fasten upon Kirkman any violation of the Corrupt Practice Act. At the time the negotiations for the car were initiated, nothing was said about the election or Lamb's support. That the Ford was then junk and worthless is obvious. Aside from the testimony of Lamb as to the small value of the car after eight days of labor and used parts had been put upon and in it, the lack of any market for or of any value of an old Ford touring car in the condition this one is described to have been in before its repair is universally known. So there is nothing suspicious in Kirkman giving away an old piece of junk such as this was. It may be that Kirkman was secretely actuated by the hope that maybe Lamb would be grateful for the gift; but such a hope does not amount to a violation of the Corrupt Practice Act. The car was repaired by Lamb's labor and old secondhand parts. These parts, when new parts for Ford cars of the old modle T type could and can yet be purchased so cheaply, must have been negligible in value. But, even if the transfer of the car be held not to have taken place until Lamb got the car in running order, at the best all that can be said for the appellant is that Kirkman gave Lamb the car in consideration of Lamb working for him by hauling voters on election day. That would not be a violation of the Corrupt Practice Act either. That Lamb was grateful and electioneered for Kirkman is obvious and is to be expected. He swears positively that he did not vote for Kirkman because of the gift of the car.

There is no showing that any one of Lamb's relatives voted for Kirkman, although Lamb asked them to do so. The only thing that casts any suspicion upon this transaction was the taking of the mortgage after the election. It may be that Kirkman never regarded the

transaction as a gift, though Lamb is positive in his testimony that it was. Probably the true reason is that Kirkman, after the contest was filed, became apprehensive that the transaction might be construed as a transfer of the car in consideration of Lamb working on election day for Kirkman by hauling voters, and that such would be considered a violation of the Corrupt Practice Act, whereupon he did the foolish thing of taking this mortgage, to give it a more innocent, as he thought, appearance. But, though his conduct in such case cannot be commended, his foolish act cannot turn a legal transaction into an illegal one. We find no merit in appellant's contention as to this transaction.

2. D. R. Powell testified that appellee requested him to go to his voting precinct in Trenton and ascertain the number of floating votes therein and the amount of money that would be required to handle them in Kirkman's behalf in the primary. Powell refused to have anything to do with the matter. Kirkman flatly denied making the proposition. It is said that Kirkman is an interested witness, whilst Powell was impartial and should be believed. The fact nevertheless remains that it does not prove any more than a willingness at one time to engage in a corrupt practice. It does not forbid the assumption that Kirkman changed his mind and did not pursue the corrupt purpose. Damron v. Johnson, 192 Ky. 523, 233 S. W. 910; Baker v. Colson, 210 Ky. 277, 275 S. W. 879.

But appellant contends that the corrupt purposes of Kirkman were executed. They rely upon J. A. Taylor, who testified that J. F. or Frank Kirkman, an uncle of appellee who lived in Trenton, was busy on election day bringing voters to the polls and working in conjunction with a man named Green, who was shown to have paid voters. What Taylor testified was this: That he saw Kirkman come down the street with some fellows to the voting precinct where Green was working. He saw Kirkman only once or twice come with people to that precinct. Mr. Kirkman left and went back to his store. He did not say that Kirkman spoke to Green, or had any connection with him. The men who came with Kirkman did talk to Green a few minutes, and then voted, but it is not shown how they voted. Green afterwards handed voters envelopes containing money. The envelopes were torn open and left at the place, and some of them were intro-

duced in evidence. It was shown that there were numerous candidates with workers at the polls.

Green was not introduced as a witness. He is not shown to have had any connection with R. T. Kirkman, but was his supporter. J. F. Kirkman himself did not speak to Green, but the men who came with him talked to Green. Taylor positively stated that he could not say whether any of the men who came with Kirkman got any of the envelopes from Green. All he could say was that Green talked to them before they went in to vote. R. T. Kirkman testified that neither Frank Kirkman nor Green had or handled any money for him in the primary. Taylor did say that both Kirkman and Green were working for Robert T. Kirkman, but Green was working also for other candidates. Frank Kirkman did not testify. It was shown that he had been absent from the county during the taking of depositions and was at a health resort in Tennessee. R. T. Kirkman testified that his uncle was sick, and had been for a year.

That circumstance is very suspicious, but in the absence of more definite proof connecting J. F. Kirkman with the purchase of votes, or to show that Frank Kirkman was not really sick, it is not unreasonable to indulge the presumption of innocence, when it is uncontradicted that he was absent because of illness. If he had handled any money for his relative on election day, or had any connection with Green, a different question would arise. It is argued that we should assume that the appellee had procured his uncle and Green to do the corrupt work in Trenton that he had proposed to Powell, but the proof is not sufficient to justify that assumption. Everything that Green did may have been for the other candidates, and it is not shown that either R. T. Kirkman or J. F. Kirkman had any knowledge of the purchase of votes by Green. Guilty knowledge of a corrupt practice may be shown by circumstances, but the circumstances must be such as to connect the candidate with the unlawful act. The chancellor's finding on this issue is not shown to be erroneous.

3. Lindsey was connected in business with Kirkman and had a joint account with him in the bank. Mr. and Mrs. J. L. Landers testify that a few days before the primary Mr. Lindsey requested Mr. Landers to carry $125 of Kirkman's money to Mr. Hooser, a candidate for magistrate in the Guthrie district. Mr. Landers refused to do it, and Mr. Lindsey stated that he would get some

one else to take it. He also stated that he did not wish to take the money himself, because Mr. Kirkman had made a deal with Hooser's adversary in the race for magistrate, and he did not wish to be seen in communication with Hooser. Lindsey denied that he requested Landers to take the money, but did not deny that he made the other statement.

The testimony of Mr. and Mrs. Landers is direct and positive, and bears the impress of truth; but statements by Lindsey are not binding on Kirkman, unless it was shown that he was representing him with his authority. When these statements were adduced, it was evidently the purpose of contestant to prove that Lindsey was the authorized agent of Kirkman; but Lindsey and Kirkman both denied that such was the fact, and there was no competent proof that Lindsey did have authority to represent Kirkman, or that Kirkman had any knowledge of his action. Furthermore, it was not shown that the money was to be used corruptly. It may be inferred that such a large amount of money in the hands of a candidate in a magisterial district raised a presumption to that effect, but Hooser denied that the money was ever sent to him, or that he used any money. Assuming that Lindsey once had the purpose of providing the money for Hooser, it should be proven that the purpose was executed. In view of the meager facts established, we cannot disturb the chancellor's finding that Kirkman was not connected with or disqualified by this circumstance.

4. J. B. Miller testified that Claude Kimbrough, of Guthrie, was a worker for Kirkman, and proposed to him that he join a jackpot to be used for Kirkman and Miller and another candidate or two, stating that they expected to vote 200 negroes in the Democratic primary, and that they would have to be paid. The proposition was rejected, and it is not shown that any pool was formed or any jackpot raised. All that was proven to establish this corrupt conspiracy was that many negroes had voted in the primary. It was also proven that these negroes had voted for the Democratic nominee for President in 1928, and were entitled to vote in the primary. Kimbrough was interested in other candidates, and it was not shown that he had any authority to represent Kirkman, or that Kirkman had any knowledge of the proposition made to Miller if it was made. Miller himself was a candidate for jailer, and, in the absence of showing that the jackpot was raised and that Kirkman

was a party to it, there is a failure to connect Kirkman with it.

5. J. D. Puckett testified that he paid some voters. He acted upon the request of Gene Scott, who was an election officer, who sent Puckett to another election officer, named Kimbrough, where he was given $100 to pay the voters. He said that Scott and Kimbrough were both supporters of R. T. Kirkman, but he did not know whose money he handled, or whether the voters he paid had voted for Kirkman, or at all. Scott and Kimbrough positively deny the transaction. Some of the floaters testified that they had received money from Puckett, but they did not say that it was Kirkman's money, and they did not connect either Kimbrough or Scott with the transaction.

It is simply impossible to spell out of this testimony anything that would disqualify Kirkman. Scott did not handle Kirkman's money, and Kimbrough was interested in other candidates. Puckett was working for his brother-in-law, Miller, who was a candidate for jailer, and it is argued plausibly that he was paying the voters on the assumption that they had voted for Miller. In any event, the proof is not sufficient to convict the appellee of a violation of the law through the acts of others. The fact that they were for Kirkman must be considered in the light of the fact that they were for a number of other candidates, among whom there was no pooling of interests. Manning v. Lewis, 200 Ky. 732, 255 S. W. 513; Duff v. Salyers, 220 Ky. 546, 295 S. W. 871; Felts v. Edwards, 181 Ky. 287, 204 S. W. 145; Hardin v. Horn, 184 Ky. 548, 212 S. W. 573.

6. Great stress is placed upon a transaction with T. R. Gill to the effect that he had withdrawn from the race for county clerk at the request of Mr. Kirkman and in consideration of a promise to make him a deputy sheriff at a salary of $100 per month. It is strenuously insisted that this was a corrupt practice engineered by Kirkman, in order to obtain the support of the McElwain family. Frank McElwain was a candidate for county court clerk, and Gill's withdrawal left him without opposition. He had no Republican opponent, and was thus assured of election. It is insisted that Kirkman thus obtained the influence of the McElwain family. Kirkman places a different version on the transaction. He says that he wanted Gill for his deputy, even before he announced for clerk; that Gill and the McElwains were

already for him, and that he received nothing on account of the transaction.

We assume, however, that the transaction must be considered exactly as detailed by Gill, and that was that his withdrawal was induced by Kirkman, in order to obtain the support and influence of the McElwains. Yet all he did to obtain such support was to select in advance a deputy sheriff, and the Corrupt Practice Act, as construed by this court, does not forbid such a transaction. The matter was given thorough consideration in the case of Van Meter v. Burns, 176 Ky. 153, 195 S. W. 470, 471. It was held that a promise, in consideration of support, to make appointments of particular persons to office, was not forbidden by the act. Graham v. Alliston, 180 Ky. 687, 203 S. W. 563; Hardin v. Horn, 184 Ky. 548, 212 S. W. 573. Counsel for appellant make an earnest argument that such a bargain is wrong and should not be countenanced, but the construction of the Corrupt Practice Act has been consistently followed since 1917, and the Legislature has not seen fit to change it. It is to that tribunal the argument should be addressed, if it is thought expedient to condemn transactions such as that involved in this case.

7. A number of segregated circumstances are suggested as pointing to the conclusion that Kirkman was guilty, both directly and indirectly, of corrupting the election. We have considered these instances with great care, and are unable to find sufficient proof to warrant the conclusion that appellee himself violated the act, or that it was violated by others in his behalf with his knowledge or consent. Douglas v. Green (Ky., decided Oct. 11, 1929) 20 S. W. (2d) 1026. There is much evidence that is suspicious, but it falls short of the standard established by the decisions for depriving a candidate of his nomination. This court will not disturb the finding of the chancellor on the facts, unless the evidence, reasonably construed, shows that the candidate himself violated the act, or suffered it to be done by others in his behalf, and with his knowledge. Manning v. Lewis, 200 Ky. 732, 255 S. W. 513; Napier v. McIntosh, 220 Ky. 539, 295 S. W. 856.

The judgment is affirmed.