## Mounts v. Hatfield.

## Hatfield v. Mounts.

(Decided Oct. 17, 1933.)

W. W. BARRETT for D. C. Mounts.

STRATTON & STEPHENSON for R. D. Hatfield.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming in part and reversing in part.

In the recent primary election for the Republican nomination for magistrate in one of the districts of Pike county, D. C. Mounts received 313 votes; L. W. Sowards, 285; and R. R. Hatfield, 270. Three other candidates received fewer votes. Mounts was given a certificate of nomination, and in due time Hatfield instituted a contest against him and Sowards. Mounts traversed and counter-contested. Although summoned, Sowards made no response. Issues other than the violation of the Corrupt Practice Act (Ky. Stats. sec.

1565b-1 et seq.) have passed out of the case. The trial court, with a special agreed local judge presiding, held that Sowards was out by reason of his default; that Mounts was guilty of offending against the election anti-bribery law; and that Hatfield's petition of contest was fatally defective by reason of the omission to negative his own like fault. Both Mounts and Hatfield appeal.

It may be well for convenient consideration to note the material provisions of the Corrupt Practice Act. Section 1565b-3, Statutes, makes it unlawful for a candidate to "expend, pay, promise, loan or become pecuniarily liable in any way for money, or other thing of value, either directly or indirectly, or * * * in consideration of the vote or support, moral or financial, of any such corporation, association or person." By Section 1565b-11, it is provided that if it appears upon the trial of an election contest that the provisions of the act have been violated by a candidate or by others in his behalf with his knowledge, his nomination is made void and the candidate who has received the next highest number of votes and who has not violated the provisions of the act shall be declared the nominee. It is not amiss here also to refer to section 150 of the Constitution, providing for the exclusion from any office of trust or profit for the term for which he shall have been elected of any candidate who shall be convicted of having given or consented to the giving, offer, or promise of any money or other thing of value to procure his election, or to influence the vote of any voter at such election. Section 151 of the Constitution requires the Legislature to provide suitable means for depriving a candidate of his nomination or election if he has been "guilty of fraud, intimidation, bribery, or any other corrupt practice, and he shall be held responsible for acts done by others with his authority, or ratified by him." Section 1586 of the Statutes provides that any person guilty of receiving a bribe for his vote or his services or influence shall be fined and excluded from office and suffrage. Section 1587 provides that whoever shall bribe another shall on conviction be fined and imprisoned, or both, and be excluded from office and suffrage. Little attention seems to be given these criminal laws by prosecuting officers, notwithstanding the

many free admissions and the clear proof of guilt appearing in numerous election contest cases.

We note, first, the evidence respecting the charge that the contestee Mounts violated this law. Anthony Coleman testified that early in the campaign Mounts rode up to his gate with his mother and told him he was "figuring on" him handling the money in his precinct, although he did not become burdened with that responsibility. Mounts denied this, but his mother did not testify. Friday night before the election Mounts rode around encouraging the voters with an inducement of $2 for everybody who voted for him. So did his lieutenants, Ance Casey and Hiram Smith. Mounts says he made no such promises. Ance and Hiram are not heard from. George Sullivan testified that around midnight, when Alex Dotson, Jess Sullivan, and Tom Witt were present, Mounts informed them that, while he had no money to spend, his brother was going to spend some, but "I can't help that." The defendant admits all of this, except the part about his brother. The other three men are as silent as the tomb.

On election day there was much activity at the Blue Springs precinct. Mounts admits he was there a good part of the time. There was found nearby, within a few feet of where he had recently been in his automobile, a paper band such as is commonly used by banks to wrap around bundles of currency. It was labeled $100. Mounts knows nothing about this, he says, and it is suggested by a divining witness that it may have been part of the literature that was being dropped by an airplane over the country for a woman candidate for a county office. It is not contradicted in any degree that Ance Casey, Hiram Smith, Alex Dotson, and several others with whom Mounts was seen conferring during the day were boldly and openly buying votes. Sometimes Ance would merely shake hands with the voter and when the grasp was broken he or she would find $2 in his or her hand. No solution of the mystery was attempted. There was strong evidence that the contestee's mother, aunt, brother, and other relatives were also engaged in this bribery, but some of this evidence was opposed by contradictions, which, however, were more or less like a sieve. As an exploring expedition, contestant took the deposition of the ubiquitous Ance Casey. He denied that Mounts had

furnished him with the money that he used, but when the questions became pointed and painful, he uniformly answered simply, "I pass." And pass he did. The world dwells in darkness as to the source of his filthy lucre. Although these violently zealous activities of the members of his immediate family and other trusted lieutenants were as much concealed as the life of the proverbial goldfish, Mounts says that he was not aware of them. It is quite singular that sometimes men are blind to those things that are as plain to all other eyes as is the sun at its meridian height. "None are so blind as those that will not see."

In other precincts, candidate Mounts' wife, brothers, other near relatives and friends lavishly and openly bought votes for him. He denied knowledge of this, and further testified he knew his wife had no money when she left home. One of the brothers deposed it was his own money that he used. The direct bribers might have exculpated their candidate as the source of their funds, but their voice is not heard.

But that is not all. Not one but several witnesses testified that in the afternoon they were told the tragic news that the money had run out and they would have to "wait until Bud (Mounts) came back." It may have been a mere coincidence, but shortly after his return to the polls the gorge was broken and the current of cash again freely flowed. It must have been about this time, in the late afternoon, when according to J. T. Alley, Mounts asked Alex Dotson if he was broke, and Alex said that he was about "dry" and that there were two voters over there ready. Mounts reached into his pocket and handed some money to him and he went over there and got two women, took them over to the polls, and when they came out he gave them some money. Perry Hatfield testified that Mounts asked if he had voted, and, responding that he had, Mounts then told him "Go right around the corner and get your money." He did so, and Butler Coleman, Mounts' first cousin, presented him with four dollars, half of it being for his wife. Coleman and Mounts deny this, although it is admitted that Coleman was hauling voters for hire and was busy in behalf of his kinsman. Louis Shepherd deposed that Alex Dotson and Mounts, standing together, promised him $3 for his vote, and when he suggested the need of a drink of whisky also, Bud told him where the jar

could be found. He must have tarried long at the fountain, for when he got back Bud was gone and he didn't get anything. Mounts denies this. Dotson does not testify. Shepherd is impeached by a bad reputation.

Hazel Chapman testified that the contestee's brother, Jake Mounts, promised her $6, half of which was for another woman. Coming out of the polls she went to the automobile in which contestee and another man were sitting and engaged him in a brief conversation as to his family. His companion in the car told her to come to the other side, which she did, and he gave her $6. She walked over to her friend, but "chiseled" her by keeping $4 and giving her $2. This witness was shown to have an evil reputation, although some of the witnesses by whom it was established were likewise tainted. However, she is substantially corroborated by her friend. Mr. Mounts admits all of the incidents except the transfer of money, and says that if that happened he didn't see it. We must accept as true the saying of old that there are eyes that see not and ears that hear not. His companion is not identified or heard from.

H. W. Prater, a cautious witness, deposed that on his way to the election Mounts gave him a ride. On the way he informed him that he knew where he could get some voters, but that it would take some money. Mounts asked how much, and when told $2 each, he said to the witness, "All right, get them down there. You won't fib me will you, Buddy?" and he answered, "No, when I promise a man a bushel of beans, he gets a bushel of beans." But for once he was sadly unfortunate in his promise, for, truth to tell, he never produced a single "bean".

There is other testimony of more or less probative value and other significant circumstances which tend to establish the charge that the contestee Mounts violated the act. Notwithstanding his self-exoneration by emphatic testimony that he neither directly nor indirectly spent any money or encouraged others to do so for him, and that he never violated the law either in letter or spirit, and despite his specific denials of the several instances connecting him with this carousal of corruption, incredulous indeed would be the man who could read this record without being convinced that the candidate

is brought within the law which takes from him, under the circumstances, the fruits of victory.

We turn to the case against Hatfield.

Nowhere in his petition did he as contestant allege that he did not violate the provisions of the Corrupt Practice Act himself. In Humbert v. Heyburn, 240 Ky. 405, 42 S. W. (2d) 538, such an omission was held to be a fatal defect. It was upon this ground alone that the trial court decided against Hatfield so far as his right to the nomination was concerned, although it was held that he had the right nevertheless to maintain the action against his opponent. The contestee here filed a demurrer to the petition, but, unlike the practice followed in the Humbert Case, he did not insist upon a ruling upon his demurrer but proceeded to set up in a counter-contest full and specific allegations that the contestant had so offended. This was denied by him in his reply. The issue was therefore effectually made, and a trial of it was had. So it must be held that the defect in the petition was thereby cured. Civil Code of Practice, sec. 134; Interstate Coal Company v. Trivett, 155 Ky. 795, 160 S. W. 731; National Council Junior Order U. S. A. M. v. Thomas, 163 Ky. 364, 173 S. W. 813; Commonwealth Life Insurance Company v. Burnett, 214 Ky. 156, 282 S. W. 1072.

The only substantial evidence against Hatfield centers around Troy Dotson and C. J. (Neely) Hatfield.

Dotson testified:

"Well, we was talking, but I was talking to Wade Coleman first and I told him that I wasn't going to vote for no one unless I got some money and I told him to go and see Bud Mounts, but he didn't get any from Bud, and then I told Ransom (contestant) I had to have some money to get some liquor before I'd vote for anybody and he give me twenty-five cents and said that was all he had and he said he would get some more or have some money, someway or other, and he give me a dollar and I went and got a half gallon of liquor."

He stated "the whole yard was full" of people, but he could name only Wade Coleman and Jake Hatfield. Coleman, a cousin and worker for Mounts, testified that Dotson asked him to see Mounts about some liquor, which he did, but he said he didn't have any. When he

reported to Dotson the latter declared that he wouldn't vote for anybody unless he got some liquor. Later the witness saw him talking to contestant and the latter give him a bill of money. Jake Hatfield testified that he asked Dotson if he had any liquor, and he responded he had not but that he was going to see "Ransom and if he don't give me a dollar I won't vote"; and he later saw him talking to the contestant. But Dotson thinks maybe he had voted before all this occurred. Later Troy gave the witness a drink. The contestant emphatically denies all this. The reputation of Troy Dotson and Wade Coleman was proven by several witnesses to be bad, and that they are unworthy of belief. Only Dotson's stepmother and his impeached companion, Coleman, undertook to establish a good reputation for him. Moreover, John Coleman related a conversation in which Troy Dotson said, in reference to the contestee, Mounts, "If he will give me $20 I will swear that Ransom give me $2 to vote for him." Tom Mounts denies having offered Dotson any money to testify or ever having any conversation with him regarding money. Eli Sullivan deposed that he heard Troy Dotson say that he would take $200 and swear Ransom Hatfield gave him $2 to vote for him. This was apparently the same incident referred to by John Coleman. Troy Dotson denied making any such statements as these, although he was present upon the occasion referred to.

C. J. (Neely) Hatfield testified that he got $1.25 from the contestant during the day (but couldn't remember what time it was), and then that he, Troy Dotson, and two others left and went up the creek to get whisky. He admits drinking previous to this. There is evidence that he was boisterously drunk. The witness was unable to relate any circumstance or the presence of anybody that could have been looked to either for corroboration or contradiction. He does not say the money was given him for his vote. He was doing all he could for Ransom because he had done all he could for his boy who had been sent to prison. Contestant denies giving Hatfield anything. He was impeached by several witnesses, and no effort made to sustain his reputation.

Furthermore, D. J. Dotson, an 80 year old merchant in the community, testified, without exceptions, that

on the morning the parties came into the country to begin taking depositions he went with Neely Hatfield to locate his grandson, Troy Dotson, who Neely said had stolen his machine. When they got to the home of Troy's father, where he was, Tom Mounts, brother of the contestee, was there. Neely got in the car with him. He asked Troy what Tom Mounts was doing up there. We quote the witness:

"Troy says, 'He is hunting for someone to swear a damn lie for him, he wants me to go around there and swear for him.' He said, 'I ax Ransom for $1.50 to buy some liquor with and he didn't have it, and I ain't going to swear for him.' I said, 'That's right, if you don't know anything, don't go and tell nothing.' He took on down the road after Neely and Tom Mounts and I hear he went on with them. That is about all that Troy told me at that time, but he has told me different times before that he voted for Ransom and voted for him without a cent, told me that different times since the election occurred."

Troy denies the statements attributed to him by his old grandfather, and says he has a bad moral reputation. He disregards his own. But he admits talking to the old man about the election. Tom Mounts denies buying Troy's testimony. But the record discloses such perceptions as permitted him to buy votes.

There is a confusion of impeachment testimony. Some of those who testified as to the bad character of the witnesses are themselves shown to come under the tongue of evil report.

Jane Hatfield, the aunt of the contestee, Mounts, and the wife of Jake Hatfield (who undertook to corroborate Troy Dotson as above stated), testified that the contestant told her that if she did not vote for him "I don't suppose you will get any more relief or flour." She told him she could not do so, and after that her husband got only $2 more of relief. The evidence as to this matter is that the contestant had had nothing to do with the distribution of the Red Cross and government food except to report those in need and to permit a truck of merchandise to be stationed at his home in order to save his needy neighbors from having to travel farther. There is quite a bit of evidence on this sub-

ject. We well know that shortly after the election day relief funds in Kentucky were exhausted, but doubtless "Aunt Jane" thought the cessation was the candidate's penalty, and her testimony, as well as that of her husband, may not be wholly unbiased. From a full consideration of all the evidence on this point, we can find nothing substantial showing the contestant culpable of any act affecting his right to the nomination sought.

At one of the precincts the voters crowded in early and a deputy sheriff, who was employed by a coal company and was a relative of the contestant, and another man, stood at the door of the schoolhouse in which the polls were located. Some say they were obstructing the voters, and it seems some of the contestee's voters did not get to enter the polls until after the Republican ballots had been exhausted, which was about nine o'clock in the morning. Serious complaint is made against Hatfield for this. There is not a scintilla of evidence connecting him with the occurrence, nor any effort made to throw out the precinct on that account, or even to show that the contestant received a majority in that precinct. There is nothing here that would justify the imposition of a penalty upon the contestant.

Hatfield testifies he spent no money directly or indirectly. He didn't have any to spend, he says. Nobody undertakes to say that any of his workers used any money, and many of them testify their candidate gave them none and they used none.

As will be observed, the evidence tending to prove facts sufficient to justify the court in depriving Hatfield of this nomination is in contrast with that relating to Mounts. It is materially different both in character and essence. There are only two isolated acts, and the incriminating witnesses do not stand up. He who will sell his vote will sell his testimony. Everybody knows that. So when the case must rest upon the testimony of such persons, it ought to be supported or corroborated by rational circumstances or substantial verbal evidence. Taking the stories of the two discredited men at face value, it is only by implication that it shows the gift of the money was in consideration of their support. Neither claims it was. Both show other reasons for their support. In the case against Mounts there were not merely one or two incidents indicating his guilt. They were numerous, and one circumstance ad-

ded to the other multiplies the probability of guilt **and** excludes the possibility of innocence. It is the other way in the case against Hatfield. Guilty he may be, but convicted he was not. Napier v. McIntosh, 220 Ky. 539, 295 S. W. 856; Duff v. Salyers, 220 Ky. 546, 295 S. W. 871; Douglas v. Greene, 231 Ky. 44, 20 S. W. (2d) 1026; Murrey v. Kirkman, 231 Ky. 191, 21 S. W. (2d) 240; Combs v. Hogg, 250 Ky. 400, —— S. W. (2d) —— .

Wherefore, the judgment is affirmed on the appeal of D. C. Mounts and reversed on the appeal of R. R. Hatfield, with directions to cancel the former's certificate of nomination and award the certificate to the latter.