**Opinion issued December 6, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-17-00846-CV

———————————

**JOSE GREGORIO SANDOVAL, Appellant**

**V.**

**DISA, INC. & DISA GLOBAL SOLUTIONS, INC., Appellees**

On Appeal from the 269th District Court
Harris County, Texas
Trial Court Case No. 2016-51272

## MEMORANDUM OPINION

A quality control inspector in the industrial sector lost his job after his random drug test yielded a positive result for cocaine. The inspector sued the third-party administrator that managed aspects of his former employer's drug-testing program, among other defendants.

The third-party administrator, DISA Global Solutions, Inc., moved for summary judgment against Jose Sandoval, the inspector.[1] The trial court granted the motion, and Sandoval appeals. Sandoval contends that the court erred in granting summary judgment because (1) Sandoval raised genuine issues of material fact on the elements of his negligence claim; (2) DISA did not conclusively prove its affirmative defenses of legal justification and consent to defeat his defamation claim; and (3) Sandoval demonstrated that he has standing under the DTPA.[2] Finding no error, we affirm the summary judgment.

## BACKGROUND

**Turner's drug and alcohol policy**

Sandoval was employed by Turner Industries Group. Turner is an industrial contractor in the petrochemical industry. During Sandoval's employment, Turner had a drug, alcohol, and substance-abuse policy. It contracted with DISA to administer its drug and alcohol screening programs. Turner's policy required employees to submit to drug testing at various stages of employment and at random.

---

[1] Sandoval's original petition names only "DISA, Inc." as a defendant. In answering for "DISA, Inc.," DISA Global Solutions explained that "DISA, Inc." was not a proper name and identified itself as the proper defendant.

[2] Marie Sandoval, Sandoval's wife, brought a loss-of-consortium claim against DISA, and the trial court disposed of that claim in the take-nothing summary judgment. Marie is not a party to this appeal.

2

The policy also required Turner employees who were contracted to work at third-party jobsites not owned or operated by Turner to comply with both Turner's and those third parties' substance-abuse policies. Under Turner's policy:

- An employee is subject to discipline or discharge if a test shows "any detectable quantity of any illegal drug."

- All testing is conducted by a licensed independent medical laboratory.

- The testing lab must retain samples for retesting at the employee's request and expense.

- Employees have "the right to meet with the Company, to explain" adverse test results.

The policy further provides that "[a]ll testing will be in accordance with all applicable federal, state, and local drug and alcohol related laws and regulations" and that "[d]rug tests not conducted under the supervision of the Company are not recognized as approved." In the event of a positive drug test, Turner has a rehire/reinstatement policy, providing that it "will consider the applications of candidates who formerly tested positive for drugs" if they can show evidence of rehabilitation.

**DISA's role in substance-abuse screening**

DISA is a third-party administrator of substance-abuse screening programs. It houses a national Contractor Consortium program of over 12,000-member companies, referred to as DCC. DCC provides consolidated Department of

Transportation [DOT] services that allow DCC members to comply with DOT regulatory requirements by outsourcing employee substance-abuse screening and reporting requirements to DISA.

DISA's contractor consortium group for the Houston area is known as DCCHA. DISA provides a menu of services to DCCHA members. It trains members' employees about drug-screening collection protocols that comply with DOT regulations. It formulated a substance-abuse policy designed to comply with DOT drug-screening regulations. DCCHA members may adopt DISA's substance-abuse screening policy to meet the DOT requirements of their own individual site drug and alcohol screening policies. DISA also identifies qualified testing laboratories and medical review officers (MROs) which are available to analyze the specimens. DISA assists with routing specimens from the employer's site to the lab, and it will assist with routing if further analysis or retesting is required. To assist with random testing, DISA also notifies the employer when it is required and furnishes it with a list of randomly-selected employees.

DISA uses web-based management systems to provide these support services. DISA maintains a proprietary online database management system that gives members access to information about the test results of individual workers in their industry who have been employed by other members in the region.

To collect this information, DISA obtains written consent to use testing results from each member's employees. Its "Universal Membership Application Form" documents the member employee's agreement to become an "employee member" of its consortium, the North American Substance Abuse Program, or the DCC hair-testing policies. By signing the form, the employee

> agrees[s] . . . to abide by all DCC and/or NASAP and/or the Hair Testing Substance Abuse Program policies, rules, and regulations. I authorize the DCC to release my drug and/or alcohol test results to the Company Member for which I worked at the time I was tested and/or the Company Member which required me to take a post-offer of employment drug and/or alcohol tests. I also authorize the [Consortium to release DCC status, test results, and other program activity to the Houston Area Contractors Safety Council through the NASAP with the understanding that this data may affect my status in the NASAP and that this status may be shared with those Companies participating in the NASAP.

Member companies may consult the database for information about the drug-testing status of their own employees or that of prospective employees who have worked for other member companies. The database designates workers who are in compliance with their employers' substance-abuse policies as having an "active" status; those who are not in compliance are designated as "inactive." Active workers are eligible to enter a participating jobsite, although they are not guaranteed access. Inactive employees are prohibited from entering a participating company's jobsite. Member companies use the active/inactive designation to decide whether to hire workers and to determine whether workers are authorized to enter a jobsite.

**DISA's contract with Turner**

Under the "Master Services Agreement and Addendum" with Turner, DISA agreed to:

- provide Turner with a list of approved specimen collection centers;

- arrange for drug and alcohol screening for job applicants;

- arrange for drug and alcohol testing on employees (1) based on reasonable suspicion; (2) at random; (3) post-accident; (4) return to duty; and (5) follow-up, as well as other owner-mandated circumstances;

- forward specimen samples for testing at certified third-party laboratories;

- send all positive or questionable test results for review by an authorized Medical Review Officer (MRO) who is either under contract with or employed by DISA; and

- enter test results in its online database, making them available to Turner.

DISA did not collect specimens, conduct testing, or analyze testing results for Turner.

The Agreement reserves to Turner the authority to make "all determinations as to whether subject individuals should be tested on a "for reasonable cause" or "post-accident" basis. It expressly states that it is intended for the "sole benefit" of Turner and DISA and that "no third-party shall be deemed a 'third-party beneficiary' of this Agreement."

**Sandoval's employment with Turner**

Turner hired Sandoval in December 2014.[3]  In accepting employment with Turner, Sandoval agreed to comply with Turner's Drug, Alcohol, and Contraband Policy.  He received a copy of Turner's employee handbook containing a description of the policy.  To satisfy another condition of employment with Turner, Sandoval signed DISA's Universal Membership Application form.  Accompanying that form was DISA's substance abuse policy, which is incorporated by reference into the membership contract.

Turner assigned Sandoval to work as a Quality Assurance/Quality Control Inspector under its contract with LyondellBasell Chemical Company.  Sandoval performed this assignment at LyondellBasell's facility in Corpus Christi, which is primarily involved in producing and transporting ethylene, propylene, and other petrochemical products.  Among other duties, Sandoval inspected and evaluated construction and repair work performed at the facility and on vessels that LyondellBasell used for chemical transport to ensure compliance with codes and other specifications.  Sandoval was responsible for maintaining inspection records and ensuring implementation of corrective measures where necessary.

---

[3]    Turner is not a party to this suit because Sandoval's claims against it were subject to arbitration.

7

When Sandoval accepted Turner's Corpus Christi assignment, he signed an authorization permitting

> the DCC to release my drug or alcohol test results to the Company Member for which I worked at the time I was tested and/or the Company Member which required me to take a post-offer of employment drug and/or alcohol tests. I also authorize the DCC to release information about my status in the DCC to those companies on whose premises I seek to work or am currently working. I also authorize the DCC to release DCC status, test results, and other program activity to the Houston Area Contractors Safety Council through the NASAP with the understanding that this data may affect my status in the NASAP and that this status may be shared with those companies participating in the NASAP.

**Sandoval's random selection for testing**

In September 2015, DISA notified Turner's Medical Department Supervisor, Carlos Osorio, that its random pool selection process had chosen several employees, including Sandoval, for drug screening. Osorio informed Sandoval that he had been selected for random screening and told him to report to Turner's Corpus Christi personnel office for specimen collection.

Medical Assistant/Technician D'Aldo Alaniz, a Turner employee, was charged with collecting the urine specimen from Sandoval. Alaniz had received a Certificate of Completion for training as a DOT Urine Specimen Collector in February 2015.

Sandoval reported for testing and, under Alaniz's supervision, provided a urine specimen. Alaniz performed a preliminary test on the specimen showing that

no drug was present. Alaniz then prepared the specimen for delivery to the testing lab. He filled two specimen bottles, labeled the bottles A and B, sealed them, had Sandoval initial them on the seal, and put them into plastic bags.

Sandoval's specimen was sent to Clinical Reference Laboratory in Kansas for analysis. The lab informed DISA that the specimen tested positive for cocaine. The specimen was forwarded to University Services, LLC for retesting. Benjamin Gerson, an MRO with University Services, confirmed the positive result.

On September 21, 2015, DISA notified Turner, through Osorio, of the result via an automatically generated email. Also on that day, DISA changed Sandoval's status in the DCC database from "active" to "inactive."

Turner terminated Sandoval's employment for violation of its substance-abuse policy on September 22nd. The same day, Sandoval had a verification interview with Dr. Gerson. In his interview, Sandoval confirmed that he was not on any medications and was not a drug user. Dr. Gerson verified the test results and sent the verification records to DISA.

Also on that day, Sandoval provided a lab that was unaffiliated with Turner or DISA with a hair sample, and he paid for a 12-panel follicle test. On September 25th, that lab reported to Sandoval that his hair follicle tested negative for the presence of any drug. Sandoval also paid for a retest of the urine specimen collected by Turner.

9

University Services sent a letter to Clinical Reference Laboratory asking it to ship either an aliquot or a split specimen to Quest Diagnostics for retesting. Quest's records indicate that Quest first received a specimen bottle labeled A, which had a broken seal, instead of an aliquot of the specimen in bottle A. Quest alerted DISA to the situation. Page 1018 of the clerk's record shows that the following day, Quest received bottle B of Sandoval's September 2015 specimen, which Quest used for the retest. Like the specimen in bottle A, the specimen in bottle B also tested positive for cocaine. Randy Barnett, another MRO with University Services, confirmed Quest's result.[4]

Sandoval informed his former supervisors at Turner that he had submitted to hair follicle testing and had obtained a negative result, contrary to the Kansas and Quest results. Ultimately, Turner did not reinstate Sandoval, and the inactive-status designation remained on DISA's database.

Sandoval sued DISA, the testing laboratories, and a medical review officer, claiming negligent sample collection and transport, negligent testing, defamatory report of the positive test results to third parties, and violations of the Texas

---

[4]  The labs and University Services completed forms for Sandoval's specimen to document the chain of custody for each step of the testing and review processes. At each step, these parties kept DISA apprised of the results and DISA, in turn, provided the information to Turner, along with recommendations for handling Sandoval's employment in compliance with applicable regulations.

Deceptive Trade Practices Act. The trial court granted the medical review officer's special appearance, and Sandoval nonsuited all remaining parties except for DISA. The trial court granted DISA's motion for summary judgment on traditional grounds, and Sandoval brought this appeal.

## DISCUSSION

### A. Summary-judgment standard of review

Sandoval challenges the propriety of the trial court's take-nothing summary judgment on his negligence, defamation, and DTPA claims. We review summary judgments de novo. *City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 258 (Tex. 2018). When the trial court grants summary judgment without specifying the grounds for granting the motion, as it did in this case, we must affirm its judgment if any of the grounds advanced by the movant supports the ruling. *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 680 (Tex. 2017).

DISA moved for summary judgment on both traditional and no-evidence grounds. When reviewing the grounds for summary judgment, we take as true all evidence favorable to Sandoval and indulge every reasonable inference and resolve any doubts in Sandoval's favor. *Sommers for Ala. & Dunlavy, Ltd. v. Sandcastle Homes*, 521 S.W.3d 749, 754 (Tex. 2017).

As to the traditional grounds, DISA bore the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of

11

law.  TEX. R. CIV. P. 166a(c); *Oncor Elec.*, 539 S.W.3d at 258–59.  To meet this burden, DISA was required to conclusively negate at least one essential element of each of Sandoval's causes of action or conclusively prove all the elements of an affirmative defense.  *KCM Fin. v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015).  "An issue is conclusively established 'if reasonable minds could not differ about the conclusion to be drawn from the facts in the record.'" *Cmty. Healthsys.*, 525 S.W.3d at 681 (quoting *Childs v. Haussecker*, 974 S.W.2d 31, 44 (Tex. 1998)).

As to the no-evidence grounds, DISA had to identify one or more essential elements of each of Sandoval's causes of action for which there was no evidence. TEX. R. CIV. P. 166a(i); *Cmty. Healthsys.*, 525 S.W.3d at 695–96. To defeat the no-evidence grounds, Sandoval had to adduce more than a scintilla of evidence raising a genuine issue of material fact as to each challenged element.  *See Lightning Oil Co. v. Anadarko E&P Onshore*, 520 S.W.3d 39, 45 (Tex. 2017).

## B. Legal duty

Sandoval contends that the summary-judgment evidence raises fact issues showing that DISA assumed a legal duty to use reasonable care in ensuring accurate drug-test results.

### 1. Applicable law

To overcome summary judgment on his negligence claim, Sandoval must raise material facts showing that (1) DISA owed him a duty; (2) DISA breached its

duty; (3) DISA's breach of that duty proximately caused his injuries; and (4) damages resulted from that breach. *See Mission Petrol. Carriers. v. Solomon*, 106 S.W.3d 705, 710 (Tex. 2003).

Whether a duty exists is a question of law. *Id.* (citing *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 351 (Tex. 1995)). We consider various factors in determining whether circumstances provide a basis for imposing a legal duty, "including the risk, foreseeability, and likelihood of injury weighted against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990), *quoted in Mission Petrol.*, 106 S.W.3d at 710; *see also Nabors Drilling, USA v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009) (explaining that liability in negligence is grounded in public policy holding individual responsible for injuries caused by reasonably foreseeable consequence of act or omission) (quoting *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987)).

Sandoval claims that DISA assumed a duty of care through its administration of Turner's drug-testing program and breached that duty by (1) reporting that Sandoval's specimen tested positive for the presence of cocaine; (2) failing to exclude other possible causes for the positive test result; and (3) identifying his status as inactive in its database. In addition, Sandoval claims that DISA committed

negligence per se by violating regulatory requirements of the Pipeline and Hazardous Materials Safety Administration, which requires each operator to "maintain and follow a written anti-drug plan that conforms to the requirements of [Title 49, Part 199] and the DOT procedures." *See* 49 C.F.R. §§ 199.101.

Sandoval casts his negligence issue as one of first impression, seeking to distinguish the Texas Supreme Court's decisions in *Mission Petroleum*, 106 S.W.3d 705, and *SmithKline Beecham*, 903 S.W.2d 347. Both *Mission Petroleum* and *SmithKline Beecham*, however, address negligence claims arising from workplace drug-testing and directly evaluate whether a third-party non-employer owes an -employee a legal duty. Like the lab in *SmithKline Beecham*, the third-party administrator in this case performs a specific, contracted-for function in the employer's drug-testing protocol. And, like the in-house employee drug and alcohol testing in *Mission Petroleum*, the drug testing in this case, according to Sandoval, is subject to a parallel regulatory framework.

In *SmithKline Beecham*, the plaintiff's prospective employer contracted with the lab to perform its drug testing. *Id.* at 348. After the plaintiff's urine tested positive for opiates, the company withdrew its job offer. *Id.* Later, the plaintiff learned that consuming poppy seeds could lead to false-positive test results and reapplied for the position, informing the company that she had taken one of her roommate's Vicodin and had eaten several poppy seed muffins in the days before

14

the test. *Id.* at 349. The company again refused to hire her, this time citing the plaintiff's failure to disclose that she had taken Vicodin without a prescription. *Id.*

The plaintiff sued the lab for negligence, claiming that it had breached a duty to disclose that ingestion of certain substances could cause a positive test result. *Id.* The Texas Supreme Court held that an independent drug-testing laboratory had no duty to warn job applicants that ingestion of poppy seeds or other substances could cause positive drug-test results. *Id.* at 353–54.

Sandoval relies on the intermediate court's decision in that appeal, *Doe v. SmithKline Beecham Corp.*, to claim that DISA owed a duty to monitor urine-collection procedures because failure to do so creates the danger that false positive test results might be published to third parties. 855 S.W.2d 248 (Tex. App.—Austin 1993). Sandoval fails to acknowledge, however, that in rejecting the duty urged in that case, the Supreme Court also rejected the lower court's rationale for imposing it. *See SmithKline Beecham*, 903 S.W.2d at 356 (modifying court of appeals' judgment, which reversed trial court's summary judgment in favor of lab on Doe's negligence claim, to affirm trial court's ruling). Pointing to the written contract between the company and the lab, the Court declared that "SmithKline should be allowed to perform only the service it chose to offer, and [the prospective employer] chose to procure—testing for the presence of drugs in the body." *Id.* at 354. The Court thus concluded that the lab did not owe the test subject a duty to

15

advise the employer about possible, non-drug-related causes for a positive test result. *Id.* at 353.

In *Mission Petroleum*, the Court confronted the issue of "whether an employer owes a duty to an at-will employee to use reasonable care when collecting an employee's urine sample for drug testing pursuant to DOT regulations." 106 S.W.3d at 710. The Court rejected the appellant's request to create a new common-law duty on employers who conduct in-house drug testing based, in large part, on the "significant avenues of redress" available under the federal regulations. *Id.* at 713. These substance-abuse screening regulations, which, Sandoval acknowledges, apply to him, redress the issues for which Sandoval seeks a common-law remedy: they protect employees who refuse to sign consent forms, release forms, or custody and control forms, as well as those who refuse to initial the seal on the specimen bottles if the employer fails to follow specimen collection protocols. *Id.* (citing, inter alia, 49 C.F.R. § 40.33(a), (c)). Further, the regulations safeguard against faulty results; they require an MRO to review positive test results, and authorize the officer to examine the collection procedures, trace the chain of custody, and interview the employee to determine whether factors other than drug use could have caused the positive test result. *Id.* (citing, inter alia, 49 C.F.R. § 40.33).

Given the federal regulatory framework, the Court concluded that the risk of harm from a false-positive drug test "is reduced by the protection the DOT regulations afford to the employees." *Id.* at 715. As a result, the Court "decline[d] to impose a common-law duty on employers who conduct in-house urine specimen collection under the DOT regulations." *Id.* In this context, we turn to Sandoval's claims against DISA.

## 2. Analysis

Sandoval contends that DISA's duty arises from a contractual or actual right of control that it exercises over Turner's drug-testing program, including when and how to test employee members. The record, however, does not bear out this contention. Like drug-testing companies, third-party administrators of a drug-testing programs generally "have a direct relationship only with the employer and not the employee." *Mission Petroleum*, 106 S.W.3d at 710. DISA and Turner's contract confirms that exclusive relationship here: it expressly disclaims any third-party beneficiary status, which forecloses any argument that DISA contractually assumed a duty to Sandoval. *See First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017). Further, the contract specifies that Turner's drug and alcohol policy would apply—not DISA's. This provision, coupled with Turner's communications with Sandoval about its own drug policy and its application to him, render inviable Sandoval's urged imposition of a legal duty on DISA.

17

The contract between DISA and Turner reserves all discretionary testing decisions—such as selecting employees for testing based on reasonable suspicion or in the aftermath of an accident—to Turner. It delegates only nondiscretionary administrative functions to DISA, such as notifying Turner to test its employees at junctures mandated by DOT regulations, including on hiring, return to duty, at random, and for follow-up. The inclusion of Sandoval in a list of employees generated by a randomized selection process does not raise a fact issue as to whether DISA had a right of control over Turner's random testing. Sandoval's selection for random testing lacks the causal link necessary to support his claim that DISA exercised control over Sandoval's drug test. *See Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 214 (Tex. 2008) (explaining that plaintiff must show that defendant had right to control "the specific wrongful acts that caused his injury").

The gravamen of Sandoval's negligence claim lies in the specimen collection and testing procedures: he alleges that DISA had a duty to monitor them to ensure accurate results. Contrary to Sandoval's allegations, however, the undisputed evidence shows that DISA did not assume any control over the collection or testing procedures. Sandoval alleged "on information and belief" that DISA trained Alaniz, who performed the collection for Turner. But DISA has no records that Alaniz attended DISA's training, nor does DISA's name appear on Alaniz's training certificates. The specimen collection was carried out by a Turner employee on

18

Turner property, third-party laboratories tested the specimen, and a third-party MRO analyzed and reconfirmed the positive test results.

Under the contract between DISA and Turner, DISA agreed to perform the administrative functions to facilitate the implementation of Turner's drug and alcohol policy and comply with applicable DOT regulations. DISA agreed to communicate test results to Turner and update its database to reflect the appropriate status for Turner's employees based on the results reported. As in *SmithKline Beecham*, DISA "should be allowed to perform only the service it chose to offer," and Turner "chose to procure." 903 S.W.2d at 354. By contracting to provide administrative services to Turner, DISA did not assume a common-law duty to monitor Turner's collection protocols on Sandoval's behalf to ensure the accuracy of test results for Turner's employees.

Sandoval further contends that DISA owed him a duty to ensure accurate drug-test results because it assumed a right of control over Turner's drug-testing program through its own drug-testing policy. Sandoval points to his receipt of the DCCHA policy along with the Universal Membership Application Form as evidence that DISA's policy took precedence over Turner's policy. The undisputed evidence, however, shows that when Turner hired Sandoval, it informed him that, as a Turner employee, he was subject to Turner's drug and alcohol policy. DISA performed only the administrative duties specified in its contract with Turner; no evidence

suggests that DISA assumed an extracontractual duty to either Turner or Turner's employees. Accordingly, DISA's conduct did not give rise to any duty to Turner's employees with respect to the implementation of Turner's drug-testing policy.

Sandoval's negligence per se claim stands on his allegation that DISA violated "DOT regulations," but Sandoval does not "reasonably identify" the regulation that DISA purportedly violated. *See Daugherty v. S. Pac. Transp. Co.*, 772 S.W.2d 81, 83 (Tex. 1989). Sandoval did not adduce facts supporting a claim that DISA breached a legal duty arising out of the transportation and routing activities it had contracted to perform. As the *Mission Petroleum* Court observed, employees subject to federally-regulated drug testing may avail themselves of the "significant avenues of redress" that the regulations provide. Consistent with that observation, we decline to recognize the common-law duty that Sandoval seeks to impose in this case. *See Mission Petrol.*, 106 S.W.3d. at 713.

## C.    Defamation

Sandoval contends that DISA defamed him by reporting his positive drug-test results to Turner and publishing his status as "inactive" on its database. A cause of action for defamation requires proof that (1) the defendant published a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases. *ExxonMobil Corp. v. Rincones*, 520 S.W.3d 571, 579 (Tex. 2017) (quoting *In re Lipsky*, 460

S.W.3d 579, 593 (Tex. 2015)); *Espinosa v. Aaron's Rents, Inc.*, 484 S.W.3d 533, 543 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

In its summary-judgment motion, DISA raised the defenses of qualified privilege, truth, and consent. Because DISA conclusively proved that its communications were privileged, we do not address the other defenses.

A qualified privilege justifies a communication made without actual malice, *Dun & Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896, 899 (Tex. 1970). Whether a qualified privilege exists is a question of law. *Id.* Employers and their agents have a qualified privilege to investigate reports of employee wrongdoing. *See Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2013); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). This investigative privilege "remains intact as long as communications pass only to persons having an interest or duty in the matter to which the communications relate." *Johnson*, 891 S.W.2d at 646; *Henriquez v. Cemex Mgmt.*, 177 S.W.3d 241, 253 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). The party seeking to defeat the assertion of a qualified privilege must prove that the speaker knew the statement was false or acted with reckless disregard for its truth. *Forbes Inc. v. Granada Bioscis., Inc.*, 124 S.W.3d 167, 171 (Tex. 2003).

The privilege attaches to communications made in good faith on a subject in which the author has an interest or with reference to which he has a duty to another person having a corresponding interest or duty. *Dixon v. Sw. Bell Tel. Co.*, 607

21

S.W.2d 240, 242 (Tex. 1980). As it is an affirmative defense, the defendant bears the burden of proving the communication was privileged unless the plaintiff's petition affirmatively demonstrates that the privilege applies. *Burbage v. Burbage*, 447 S.W.3d 249, 254 (Tex. 2014).

DISA's contract with Turner authorizes DISA to communicate to Turner its employees' drug-test results. It further authorizes DISA to publish the status of its employees as active or inactive in DISA's database consistent with those results. Because of the safety concerns inherent in jobs that require drug and alcohol testing, other consortium member companies have a common interest in knowing whether a worker once employed by a fellow member company has inactive or inactive status. Thus, the challenged communications fall within the privilege's scope. *See Johnson*, 891 S.W.2d at 646; *Henriquez*, 177 S.W.3d at 253.

In response, Sandoval argues that DISA cannot rely on the privilege because DISA showed "reckless disregard" for the truth. Reckless disregard requires proof that a defendant "entertained serious doubts as to the truth" of a statement. *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 158 (Tex. 2014). A defendant may negate reckless disregard by showing that it had reasonable grounds to believe that the challenged statements were true. *See Johnson*, 891 S.W.2d at 647; *Espinosa*, 484 S.W.3d at 543–44.

22

Two different certified labs reported that Sandoval's urine specimen tested positive for cocaine metabolite. An authorized medical review officer reviewed the testing protocols and confirmed that result in each instance. Sandoval has not adduced evidence that DISA knew about any alleged irregularities in the collection and testing of Sandoval's specimen. DISA reported the information it received from the labs and the MROs to Turner and, based on that information, updated the DCC database to reflect Sandoval's status as "inactive."

Sandoval suggests that the negative result of his post-employment hair-follicle test raises a fact issue as to whether DISA acted with reckless disregard. That result was not available when DISA reported the urine-test results to Turner and updated its database. Thus, the later test does not raise a fact issue to defeat DISA's privilege, particularly in light of Turner's policy that "[d]rug tests not conducted under the supervision of the Company are not recognized as approved." The evidence that DISA received the same information concerning Sandoval's test results from two independent labs that were confirmed by medical review officers defeat Sandoval's allegation of "reckless disregard" as a matter of law. *See Johnson*, 891 S.W.2d at 647; *Espinosa,* 484 S.W.3d at 543–44.

Because DISA conclusively proved its entitlement to the asserted privilege, we hold that the trial court did not err in granting DISA summary judgment on Sandoval's defamation claim.

23

**D.    Sandoval's DTPA claim fails as a matter of law because he is not a "consumer" of DISA's services.**

Finally, Sandoval contends that the trial court erred in dismissing his DTPA claim for failure to prove consumer status. Citing *Crown Life Insurance Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000), Sandoval argues that he need not prove he is a consumer to bring a claim under DTPA section 17.45(b)(12), which makes it a violation to "represent[] that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law." TEX. BUS. & COM. CODE § 17.46(b)(12).

Sandoval misreads *Casteel*. There, the plaintiff alleged a violation of section 17.46(b)(12) as part of his claim under the Texas Insurance Code, which allows a policyholder to sue its insurer for unfair and deceptive practices. 22 S.W.3d at 381; *see* TEX. INS. CODE § 541.151. Section 541.151 of the Insurance Code incorporates part of the DTPA, including section 17.46(b)(12). *Id.* at 382–83. The Court observed that the Insurance Code conferred standing if the plaintiff qualified as a "person" as defined in section 541.002(2). 22 S.W.3d at 383. Some of the incorporated DTPA provisions, the Court explained, also require the plaintiff to show consumer status, because "they deal with the misrepresentation of 'goods or services.'" *Id.* at 387 (citing TEX. BUS. & COM. CODE § 17.46(b)(5), (7), & (9)). The Court noted, however, that as incorporated into the Insurance Code, section 17.46(b)(12) does not require a plaintiff to prove consumer status because the

24

violation it describes "neither arises out of a consumer transaction explicitly, nor deals with the misrepresentation of 'goods or services.'" *Id.* (citing *Webb v. Int'l Trucking*, 909 S.W.2d 220, 228 (Tex. App.—San Antonio 1995, no writ)).

Sandoval's claim does not arise under the Insurance Code. As a result, *Casteel* does not relieve him from the requirement that he prove consumer status for standing to sue under the DTPA. *See* TEX. BUS. & COM. CODE § 17.50; *see Amstadt v. U.S. Brass*, 919 S.W.2d 644, 649 (Tex. 1996).

Sandoval also maintains that he qualifies for consumer status through his relationship to DISA through the DISA Contractor's Consortium Membership contract. The DTPA defines "consumer" as a person "who seeks or acquires by purchase or lease, any goods or services." TEX. BUS. & COM. CODE § 17.45(4). The membership application does not constitute evidence that Sandoval sought or acquired any goods or services from DISA. We therefore hold that the trial court did not err in granting summary judgment in favor of DISA on Sandoval's DTPA claim.

**CONCLUSION**

We affirm the judgment of the trial court.

Jane Bland
Justice

Panel consists of Justices Keyes, Bland, and Lloyd.